# SUPREME COURT

OF

# ILLINOIS.

---

## SECOND GRAND DIVISION.

### JANUARY TERM, 1863.

---

MATHIAS FERRARIA *et al.*

*v.*

JOHN VASCONCELLOS *et al.**

1. CHURCH PROPERTY—*all are beneficiaries.* Where a conveyance of a lot of ground is made to certain individual members of a religious body, who have no corporate existence, in trust, to them and their successors in office, for church purposes, all the members of the body become beneficiaries in such property in an equal degree, notwithstanding some of them may have contributed a larger sum than others towards the common enterprise.

2. CHURCH RIGHTS—*civil and ecclesiastical—by whom adjudicated.* While the courts will decide nothing affecting the ecclesiastical rights of a church; yet its civil rights to property are subjects for their examination, to be determined in conformity to the laws of the land, and the principles of equity.

3. DIVISION IN CHURCHES—*its effect upon the title to the common property.* So, where such religious body, after having acquired the church property in the

---

* This cause was argued at the January term, 1863, but was not decided until November of that year.

2

manner indicated, became connected with a particular presbytery, from which a majority subsequently withdrew, on account of a schism which arose in the local church on the question of the validity of Roman Catholic baptism, the minority adhering to their presbyterial connection, it was *held*, that whatever may be the ecclesiastical right of a church, or a portion of a church, to sever its connection with a particular presbytery, with or without its consent, it does not follow that the majority, in so acting, become entitled to the property of the church, to the exclusion of the minority. Their rights still remain, and should be adjusted on the principles of equity.

4.  If the majority have a right to withdraw from the presbytery, so the minority have a right to adhere to it.  Neither act works a forfeiture of the rights of either, to the church property, because, in neither case has an illegal act been done.

5.  And all the members, the minority adhering to the former church connection, as well as the majority who seceded therefrom, being equally beneficiaries of the common property, in case of a separation such as is spoken of, the property should be divided between the two parties in proportion to their numbers at the time of the separation.

6.  The fact that the majority, after their withdrawal, elected trustees, and the minority made themselves a corporation, and also elected trustees, would not change the aspect of the case ; the trustees of neither of those bodies would be regarded as the "successors in office" of the original trustees named in the deed, so as to take the title to the property, to the exclusion of the others.

7.  DIVISIONS IN CHURCHES—*departure from doctrine—its effect upon the title to the church property*.  As a matter of law, the rule is, that where a church is erected for the use of a particular denomination, or religious persuasion, a majority of the members of the church cannot abandon the tenets and doctrine of the denomination, and retain the right to the use of the property ; but such secessionists forfeit all right thereto, although but a single member adhere to the original faith and doctrine of the church.  Per Mr. Chief Justice CATON.

8.  Those who contribute to the purchase or erection of a church edifice, are presumed to do so with reference to a particular form of worship, or to promote the promulgation or teaching of particular doctrines or tenets of religion ; and to pervert the property to another purpose, is an injustice of the same character as the application of other trust property to purposes other than those designed by the donor.

9.  Hence it is, that those who adhere to the original tenets and doctrines for the promulgation of which a church has been erected, are the sole beneficiaries designed by the donors ; and those who depart from and abandon those tenets and doctrines, cease to be beneficiaries, and forfeit all claim to the title and use of such property.

10.  But where a majority withdraw from the ecclesiastical control of the presbytery, as in this case, and having the right so to do ; the minority, in

the exercise of the same right, adhering to the connection with the superior body, neither party violates the trust reposed, nor forfeits any right to the common property.

11. And where neither party has forfeited any right, and the members of the church thus separated are nearly equal in numbers, the property should be divided.

12. But it is not to be understood, that such division should be made where one party or the other consisted of a single member, or but a very few members, for then the minority might be regarded as acting obstinately or perversely.

WRIT OF ERROR to the Circuit Court of Morgan county; the Hon. D. M. WOODSON, Judge, presiding.

This was a suit in chancery instituted in the court below, by the plaintiffs in error against the defendants in error. The objects and scope of the bill, the pleadings and proofs in the cause, are sufficiently set forth in the opinion of the court.

Messrs. McCONNEL & KETCHUM, for the plaintiffs in error, cited —

23 Ill. 450, and authorities there cited; and *Miller* v. *Grable*, 2 Denio, 492; *Gibson* v. *Armstrong*, 7 B. Mon. 481; *Robinson* v. *Bullion*, 9 Barb. 64; *Trustees* v. *Sturgeon*, 9 Bar. 321; *Miller* v. *English*, 1 Zabriskie R. 317; *St. John's College* v. *Tedington*, 1 Bl. Rep. 84.

Messrs. D. A. SMITH, and CYRUS EPLER, for the defendants in error.

Mr. JUSTICE BREESE delivered the opinion of the Court.

This cause was remanded for further proceedings, at January term, 1862, in order that the parties might have an opportunity of being heard on all legitimate evidence they might see proper to adduce on another trial. *Vasconcellos et al.* v. *Ferraria et al.*, 27 Ill. 238, 240.

Much testimony has been taken, making quite a voluminous record. By the terms of the remanding order, we must look at the whole case, in the light of this additional evidence, cumulated upon the former, remaining in the first record. It

is very clear now, that the case has not been before us, in all its length and breadth, as at present developed by this record. More time having been afforded us to take its dimensions, we are now better prepared to decide the whole case upon its merits.

To understand it properly, the prominent facts must be stated.

It appears from the bill and proofs, that the parties here litigating, were known in the island of Madeira as the Free Portuguese Church, under the jurisdiction of the Free Presbyterian Church of Scotland. In 1851, they received the proper certificate of dismissal from the Free Church Presbytery of Glasgow, and came to this country. Their letter of dismissal required that they should unite with, and come under the jurisdiction of, the Presbyterian Church of the United States. On arriving at Jacksonville, in that year, they assumed to be a religious body, under the name of the Free Portuguese Church, and determined to erect a suitable building in which to worship. They purchased a lot, on the first of September, 1852, at the price of $250, and having no charter, took the deed in the name of individual members of the church, as trustees. On this lot they erected their church, part of the cost of which was subscribed and paid by the several members of the church, and a part by others who were not members, but were favorable to the undertaking; a large portion of the money, however, expended in the building, was the voluntary contribution of the Old School Presbyterian churches of the Eastern States, to be devoted, as the bill alleges, to building a church of the Old School Presbyterian order. It was not until April, 1856, that they presented their letter of dismissal from the Presbytery of Glasgow, and applied to be received into, and taken under the care of, the Presbytery of Sangamon. This application was favorably received, and they were taken into that presbytery. At this time the congregation numbered about one hundred and twenty-eight members, and, by their unanimous consent they were received into this presbytery. This church seemed to move on harmoniously, and to prosper, until April, 1858, when

a schism arose in it, producing this litigation. This seems to have been the origin of it:

The island of Madeira, being subject to the Roman Catholic crown of Portugal, the Roman Catholic was there the prevailing religion, one of the requirements of which is understood to be, that all its members shall be baptized according to the ordinances of that church. With Roman Catholics, baptism is reckoned one of the sacraments of the church, and it is a point of belief, with the professors of that religion, that no person, young or old, can be saved, without it is duly administered. Their pastor, the Rev. Mr. De Mottos, it is inferred, together with a large proportion of the members of this church, before they proselyted to the Presbyterian faith, had been baptized according to the forms of this church, in the island of Madeira, and quite rationally supposed that was all sufficient—other more conscientious members, not confiding in the saving grace of Romish sprinkling, had the ordinance again administered to themselves, according to the requirements of the Presbyterian Church, and thus dissensions arose. The question was submitted to the Sangamon Presbytery, Was baptism, as ordained and administered by the Roman Catholic Church, of any validity? A decision against its validity was rendered by the presbytery, accompanied by a declaration, as this church had been organized prior to their jurisdiction attaching, the matter was not of sufficient importance to proceed with any disciplinary measures against the recusants, but Christian forbearance was recommended to be exercised by all the parties. Whereupon, the pastor, Mr. De Mottos, probably deeming secession preferable to re-baptism, called a meeting of the congregation, and a proposition to withdraw from the Sangamon Presbytery was submitted to it. A vote was taken, alleged by the complainants to have been very disorderly and illegal, and the result was, 105 for withdrawing, 101 against it. On its announcement, the doors of the church were closed against the defeated party, the seceders taking possession of the church and its properties, and organizing a congregation, with the Rev. Mr. De Mottos at its head, as pastor.

On being advised of this, the Sangamon Presbytery appointed a committee to visit Jacksonville, to inquire into and endeavor to settle the difficulties. The church was notified thereof, and of the day the committee would desire an interview, accompanied by the request that the church should be present. On the arrival of the committee, they found the church building closed against them, and learned that a portion of the church had declared their separation from, and independence of, the Sangamon Presbytery, and refused them the use of the building. The members of the church were then requested to meet at another house of worship, in which the Rev. Mr. Allen officiated. This meeting was largely attended, for the most part by those who adhered to the presbytery, and they were informed by the committee that those who adhered to the presbytery composed the church, and would remain in possession of all the rights and privileges of the church; that they should deal kindly and patiently with the seceding party, and if they persisted in the attitude they had assumed, that it would be necessary to erase their names from the church rolls, or in some way exclude them from the church. Mr. De Mottos having ceased his labors with this portion of the church, they were promised that the presbytery would endeavor to procure a pastor for them, and were advised to continue public worship as before, and to invite the Rev. Mr. Allen to administer the sacraments, and preach to them. The committee made a report of its proceedings to the presbytery, which was approved; and continued the committee in existence, and has not yet discharged it. This church — or fragment — has continued to be represented on the floor of the presbytery by an elder, its name is still upon the roll, and its portion of all presbyterial taxes is assessed upon it and paid as before, and efforts are unremitting to supply it with a pastor.

Previous to this, attempts had been made by this church to become incorporated under the statute, but they proved abortive, when, on this division being brought about, the complainants in the bill made themselves, on the 17th of May, 1858, a regular corporation, under the name of the Free

Portuguese Church, in pursuance of the provisions of chap. 25, division 3, (Scates' Comp. 979.)

It does not appear that any pastor has been provided by the Sangamon Presbytery, and the inference from the facts, is, that the seceding party are in the constant use of the church property, the pulpit being filled by the Rev. Mr. De Mottos, the adhering party being either excluded, or declining to participate in its use, or worship in it.

Like all quarrels among religious sects, always the most inveterate, this grew daily more intense. This bill in chancery, and the tedious and expensive proceedings under it, are the fruits.

The bill prays for the restoration to complainants of the church edifice and property, as the legal owners under the deed, and in virtue of their election as trustees.

The defendants, in their answer, insist, that they are the lawfully constituted trustees of this church, and that the title to the house and lot is vested in them, and their successors in office, in trust for the majority of that church, and deny that the plaintiffs are the legally authorized trustees. They further say, in answer, that in the spring of 1858, the congregation of this church held a meeting and took a vote, on the question of remaining in the Sangamon Presbytery, and the vote resulted 89 in favor, and 106 against remaining; that they have never refused the complainants, or any of the members, the privilege of worship in this house; and in bar of the claim set up, they allege that the election, under which complainants claim to be trustees, was not held at the church; they further say, that the moneys collected to build the house, were raised and bestowed without regard to the denominational character of the church. The respondents claim to have been elected trustees on the 8th of October, 1855, and as such, the legal title to the lot and church is vested in them, and their successors in office, for the use of the majority of the church; and they insist, that the deed under which they claim the property, declares no trusts or uses relating to the ecclesiastical preference or connection of their church, but was for the use of the church, or a majority thereof, so

long as they should continue their organization, irrespective of any question of any particular ecclesiastical rule, or the claims and pretensions of any dissatisfied, disaffected, or schismatic minority.

A general replication was put in, proofs taken, and on the hearing the bill was dismissed. The cause was brought by writ of error, to the January term, 1860, of this court, and the decree reversed, we deciding, with the lights then before us, that the legal title to the lot was vested in the complainants as trustees, and that the minority, which they represented, were the true beneficiaries.

This decision (*Ferraria et al.* v. *Vasconcellos et al.*, 23 Ill. 459,) proceeds upon the ground that the election held after the division in the church, on the 17th of September, 1858, conforming, as it did, to all the requirements of the statute, (chap. 25, title "Corporations," Scates' Comp. 979,) organized a corporation, and that by the withdrawal from the Sangamon Presbytery, though the act of the majority, the seceders were no longer beneficiaries in this trust. There was then no evidence before us, that the laws and usages of the Presbyterian Church authorized any individual church to withdraw from a presbytery of that body, without consent being asked and obtained. We presumed, in the absence of such proof, that neither the constitution or laws and usages of that church, recognized such right, and therefore held, that the majority, having no right to sever this connection, unless by mutual consent, any portion of its members who continued to hold the tenets, and conform to the usages and authority of the general organization of the body, must be recognized as the church, and entitled to its property and effects.

On the rehearing in the Circuit Court, after the cause was remanded, the defendants presented evidence on the question of the right of a church, under the constitution, government and usages of the Presbyterian Church of the United States of America, to withdraw from a presbytery without its consent, but under a misapprehension of the extent of the decision in 23 Ill., the Circuit Court rejected the evidence.

The case was again brought here by writ of error, (*Vascon-*

*cellos et al.* v. *Ferraria et al.*, 27 Ill. 238,) and this misapprehension of the court below corrected, and the cause again remanded. In this opinion we said, if the right to withdraw by a church, at pleasure, does exist, according to the constitution, government and usages of the general organization, it must be proved as a fact, and like any other fact, must depend upon the evidence adduced on the trial, and therefore, this additional evidence should have been admitted. We said, further, if this evidence establishes the right to withdraw, the action of the majority was regular, and the vote of the majority, not having been protested against at the time, and no appeal taken to any judicatory of the church, had the effect to render the church independent of the Sangamon Presbytery, and by its withdrawal, all the rights and property of the church followed. But, we say, inasmuch as the counsel for the defendants in error, seem to have acted under a misapprehension of what we intended to decide by the first opinion, and may have been prevented, thereby, from taking further evidence, and from cross-examining the witnesses, instead of rendering a decree on the evidence, we will reverse and remand the cause for further proceedings, that the parties may have the opportunity of being heard, on all legitimate evidence they may see proper to adduce on another trial. Id. 240.

The evidence of some of the most distinguished and learned divines of the Presbyterian Church, some of them well and most favorably known to the court, was taken, and submitted to the Circuit Court, on this remand, on which that court dismissed the bill, and the complainants again bring the cause to this court by appeal. The new evidence taken, makes quite a volume, all of which we have examined with great care, admiring, while doing so, as well the frankness and impartiality, as the intelligence which pervades the testimony. Eminent divines of both the Old and New School, so called, were fully examined, and the record now before us, is the result. We do not propose to review all the testimony, but touch merely its most salient points, and announce what we understand from it, to be the law and usage of the Presby-

terian Church on this question of withdrawal, and the effect and consequences of a withdrawal. The counsel for the defendants in error seem to understand the decision in 27 Ill. as settling the legal and equitable rights of the parties, irreversibly. We do *not so* understand it. *It is still an open question,* to be now settled by this record. It was for this very purpose, the parties were permitted to take this testimony, and it is upon it, their rights are to be finally decided, and the cause to be now adjudged.

The weight of this testimony seems to be in favor of the right claimed by the defendants in error.

Four witnesses examined on the part of the complainants, pastors of Old School Presbyterian churches, deny the right to withdraw, without the consent of the ruling presbytery. The first one, the Rev. Charles P. Jennings, who has been near twenty years in the Presbytery of Sangamon, professing to be familiar with the constitution and laws of the Presbyterian Church of the United States of America, says, that they make no provision for the secession of a church from its presbytery, and that the offer or attempt to withdraw, would subject such church to discipline. He further says, if a majority of the members of a church, by vote or otherwise, without consent of the presbytery, withdraw therefrom, and a minority still adhere to the old organization and to the presbytery, the adhering party, be it great or small, would be the church, having all the rights thereof, including the church property. He further says, the Sangamon Presbytery does not recognize the fact, that this church ever took any vote to secede, whatever certain of its members may have done, and that the church has not seceded, and has not subjected itself to discipline. This church was instructed by the presbytery, through the agency of a committee regularly appointed, to exclude these seceders from the church, if they did not repent and come back to the rule of the presbytery. Mr. Jennings' written answers, to various questions subsequently propounded, do not change or modify what is here stated.

The Rev. John G. Bergen, who has been a minister of the gospel in the Presbyterian Church for more than fifty years,

and who has knowledge of its constitution, laws and usages, coincides. So also does the Rev. John H. Brown, who has been an officiating minister in this church for thirty-four years. The Rev. Robert W. Allen, the officiating minister of the Presbyterian Church at the place of these difficulties, a member of the Sangamon Presbytery, and who has been twenty-two years in the ministry of that church, states that since the secession of the defendants, there has been no change in this church ; that it is the same Free Portuguese Church it was originally, when it came under the rule of the Sangamon Presbytery, with this difference, that the seceding members do not now belong to it. That they have rejected the tenets of the Presbyterian Church of the United States, on the subject of Roman Catholic baptism, and having withdrawn from the presbytery without its consent, and contrary to the laws, rules and regulations of that church, cannot take and hold the property or church edifice, to the exclusion of the church consisting of the adhering members. He distinctly says, there is no law of the church authorizing them so to do. This gentleman also says, that one month before the election to withdraw, the whole number of members did not exceed one hundred and eighty or one hundred and eighty-five.

These are all the witnesses, to these points, produced by the plaintiffs in error. By arrangement of the parties, a circular letter was addressed to many eminent divines of the Presbyterian Church, containing five distinct and separate interrogatories, on these disputed points, on behalf of the defendants in error, and two on behalf of the plaintiffs, with an agreement, that their answers on honor should be read as evidence.

The following were the questions propounded :

"Can or not, a church which is united to a presbytery of the Old School denomination, by a vote, withdraw from such presbytery without its consent, and yet their action be consistent with the usages and laws of such church denomination ?

" If the members of such church do so withdraw, without consent, has not the presbytery the right of discipline and censure over such church, according to the usages and laws of such Old School denomination ?

"When a church has been erected as an Old School Presbyterian church for the use of a congregation of that order, and they have, after the erection and purchase of the property, united themselves to a particular presbytery, and afterwards a vote is taken to withdraw, and the majority do so withdraw from such presbytery, the minority remaining with it, will such vote and withdrawal of the majority be in accordance with the laws, customs and usages of the Old School Presbyterian Church, and will such action of the majority entitle them to the church property according to those laws, customs and usages, and that, to the exclusion of the minority who yet adhere to the presbytery?"

On the part of the plaintiffs in error, these questions were propounded:

"Is it or not, consistent with the constitution, government and usages of the Presbyterian Church in the United States of America, for the members of a church of that body, by consent, to take a vote as to their adherence or non-adherence to a particular presbytery without its consent; and what especially, has been the history of that church in this regard, since the formation of two General Assemblies?

"Is it or not, in your estimation, essential to Protestant freedom that every church, by mere consent of its members, may take a vote as to their ecclesiastical connection?"

The Rev. Edward F. Hatfield, a member of the third presbytery of New York, after stating his official position in the Presbyterian Church, and his familiar acquaintance with its laws, history and usages, says, the distinctions, Old School and New School, are not known in official records. In answer to the first question herein written down, after speaking of a minister renouncing the fellowship of the church, he says: "The congregation, under the care of such minister, ought to be held as still under the care of the presbytery, unless they give evidence that they have also withdrawn, in which case their name ought also to be struck from the list of congregations belonging to the presbytery."

In answer to the second question, he says: "They have nothing to do with a church thus withdrawing, but to strike its name from their roll."

In answer to the third question, he says : " The rights of property are to be determined not by ecclesiastical, but by civil courts. These courts of civil jurisdiction are governed by the action of the major part of the church. They are the church. The minority are not. These last may withdraw from the church, and form a new organization, but cannot take the place of the old church. Such have been the uniform decisions of the civil courts."

In answer to the remaining questions, he says : " The right of churches, presbyteries and synods to determine by their own vote, to which of the two bodies claiming to be the General Assembly of the Presbyterian Church in the United States of America, they will adhere, has been repeatedly exercised since 1838, warranted by act of assembly, and cannot be questioned. This right is in perfect accordance with the genius of our ecclesiastical and political institutions, and should never be relinquished by the advocates of a free press, free speech, and freedom of opinion."

Among the eminent clergymen to whom these questions were put, is the Rev. Robert J. Breckenridge, D.D., of Kentucky — acknowledged, by universal consent, one of the brightest ornaments of the Presbyterian Church, learned, wise and unprejudiced. After stating his long ministry in the Old School Presbyterian Church, and his knowledge of the laws and usages of that church, derived from careful study and diligent practice, in answer to the first question, in the order we have written them, says : " *Theoretically*, no. The church is one ; *improper* separation from it is schism, which is a sin ; *proper* separation is not contemplated as possible. *Practically*, churches leave our body when they please, without being pursued by discipline, and we accept them, when they come to us from other denominations, without scruple. But in neither case, does the church undertake to determine what is or ought to be, or may be, the civil consequences of such change."

To the second question, in the same order, he says : " There is a difference between the church withdrawing, and the members withdrawing, unless it is meant all the members, or at

least a considerable majority. I do not suppose that in either case, if the mere withdrawal was the only offense, it would be followed with discipline, certainly not, if the number withdrawing was large. In spiritual matters the church would recognize and support a minority, no matter if it should be very small. In all civil, especially in all property matters, the church claims no jurisdiction, and gives no advice, except that men should act with justice and forbearance."

Upon the remaining questions, he says : " The Presbyterian Church, as matter of discipline, would require the laws of the land and the rules of sound morals to be respected, by whichever party adhered to her. Whichever party went out from her, she would probably take no account of. The church, as such, does not own any property. Our congregations hold their property according to such principles and forms as are prescribed by law in different places. Our church has neither law nor usage except to disavow all power over the *civil* effects of such proceedings as are hypothetically stated in the interrogatory. The right of the parties in the case stated, would depend on the conditions of the title to the property, and the rules of the civil law, as judicially applied. There certainly is no rule or usage of the church, by which a majority may rob a minority, or a minority rob a majority, or the votes of either of them, unsanctioned by a presbytery or still higher church-court, may work mischief, civil or ecclesiastical, to the other. The whole power of rule and order in that church, is in the hands of church officers, united *into* tribunals, and not in the hands of popular assemblies. The distinction between Presbyterianism and Congregationalism lies here in the first instance."

To the first interrogatory of the plaintiff in error, he says, he does not know that he understands it, but answers, "it would be competent to a presbytery to consent that a congregation should take a vote as to adhering or not adhering to it, and the vote so taken would be a means of certain knowledge to the presbytery. But this is all the ecclesiastical effect the vote could have, without further action of the presbytery, and no act of presbytery could give any civil effect to such a vote, according to any law or rule of the church. If what is

meant is, that both presbytery and congregation consented to the taking of the vote, previous to its being taken, of course, fair dealing would require that all parties should acquiesce, as far as they have power, in the fair and legal results of the votes. But what are the results of that sort, depend upon many contingencies and questions peculiar to each case. The practice of the churches, since the division in 1837–8, has not been uniform, nor do I know of any law of any church on the subject. The strong and uniform advice of our General Assemblies (Old School) has been, that majorities should treat minorities with forbearance and justice, and to minorities, that they should not make schism, or go to law, if it was possible to avoid those extremities. In the present case, as far as I can judge, the difficulties do not appear to be very relevant to matters involved in the advice of our assembly."

To the remaining question, he answers, " It is undoubtedly essential to Protestant freedom, that each person should be at liberty to withdraw from whatever church he may belong to. But this freedom does not demand, that he should, by that withdrawal, be discharged from all responsibility incurred while he was a member. As to corporate and aggregate actions, there are very serious limitations to this supposed freedom of a majority to carry off a minority, or to carry off its vested rights, or to violate mutual engagements or obligations of any sort in going off. I am not acquainted with the merits of this case, and have no opinion about them, nor am I able to see how anything in the principles, rules or habits known to me, of the Presbyterian Church, bear controlingly on its decision."

We have given these statements and depositions literally, as specimens of the others, and will extract from the others only such parts as may be opposed to, or in harmony with, them.

The next in order, is an elaborate statement by the Rev. Mr. Jennings, which, being but an amplification of his testimony, already given in his own language, we forbear again to state.

Ferraria et al. *v.* Vasconcellos et al.

The next, is the concurrence of the Rev. Mr. Bergen, and the Rev. Mr. Brown, in the statement of Mr. Jennings.

A number of other depositions were taken by defendants in error, of ministers of the New School Presbyterian Church, in which there is found an entire concurrence in the statement, that since the division of the church in 1838, churches of this denomination have withdrawn without the consent of their presbyteries, and without censure or discipline, or being called in question, in any way, by the higher judicatories of the church, and they have been allowed by vote to withdraw, without censure or discipline. Numerous instances are given of this, by the witnesses. Without speaking as to its constitutionality, they all concur in saying it is the constant usage and practice in the churches of both schools. They also say, it has been the usage of that church to consider it a right in the seceding party, if a majority, to take with them the property of their church. The Rev. Mr. Nutting thinks, when a church unanimously agrees to take a vote, the result of which may be to sever its connection with the Presbyterian Church, that all those thus agreeing, have thrown off their allegiance to that church; that a majority of the membership represent that local church, and that any subsequent organization, formed of a minority of its members, would become connected with the Presbyterian Church only by a special act, re-establishing their connection. When an attempt has been made to change the form of church government, and to carry to some other body or denomination, the control of church property, specifically granted for the uses of the Presbyterian Church, a minority remaining in connection with that church, have been held entitled to the control of such property, to the exclusion of the majority, and to be considered the original church for the purpose of holding such property. In all other cases, the majority constitute the church; this is in accordance with the laws, usages and constitution of the Presbyterian Church of the United States—each local church has control over its own property, and the majority have the right to the property. Mr. Nutting also thinks that if a majority of the members of a Presbyterian church, owning property

purchased and paid for by the members, and attached to a particular presbytery, should choose to renounce the tenets of that church, and join the Roman Catholic Church, or the Universalists, or Deists, that they would have a right to take and own all the property of their original church, to the exclusion of the minority, who would not consent to turn Catholics, Universalists or Deists; and this, by the laws, usages and constitution of the Presbyterian Church. He says he would consider it, morally, a great wrong and hardship to the minority, that property so given, should be perverted to such uses, but he sees no help for it.

The Rev. Mr. Hamilton concurs, as to the uniform practice of these churches, both before and since the division, of withdrawing, with or without consent first obtained. He thinks that in a regularly organized church of the Old School denomination, regularly attached to a presbytery, if a division arises among the members, as to their tenets and belief, touching baptism, or any other essential, and one party secedes from the presbytery and denies its jurisdiction, and the other adheres to the presbytery, and to the original tenets of the church, and the two parties thus become entirely separated, the elders of the church going with the seceding party, and the adhering party elect new elders, and reorganize the church, that the seceding party is the old church, and the adhering party a new church, and the property would go to the withdrawing party. He is of opinion, that with whichever party a majority of the elders of the church may be, that is the church.

In addition to all this, the written statements, on honor, of other clergymen were received. One of them, the Rev. Albert Barnes, of Philadelphia, says, that if a majority of a church vote to withdraw, such vote transfers the church from its former ecclesiastical relation, and the church property, of course, belongs to and follows the church; but whilst the majority are thus entitled, equitable, fair and just considerations ought to govern as to the minority, so that by the exercise of a spirit of christian forbearance and tenderness, the

3

minority, as individuals may not feel that they have been harshly dealt with, or deprived of their rights.

The Rev. Mr. Mills says, all questions of property are settled by the civil courts, and when the title is vested in the congregation, and not connected in any manner with the presbytery, or synod, or general assembly, it is always understood that it goes with the majority; and such is the opinion of the Rev. Mr. Nelson.

The Rev. Cyrus L. Watson says, when a lot has been purchased, and a house of worship erected for the use of a Presbyterian congregation, a majority of that church cannot, constitutionally, go out of it, and hold the property, while the minority refuse their consent and adhere to the original compact. He thinks, if the church consents to take a vote to withdraw from a presbytery, such vote would be a pledge, on the true principle of Presbyterianism, that the will of the majority should be obeyed, and the minority morally bound to stay or go with the majority, as the vote might be. If a majority go off factiously, they are a secession, and forfeit their claim on the property.

The Rev. Mr. Hale thinks any Presbyterian church has the right, by a vote of the majority, to change its ecclesiastical relations, and only in case of special provisions in a deed to the contrary, is its property liable to forfeiture; and is not aware of any custom in the Old or New School bodies to the contrary. A reference is made by him to Judge Gibson's opinion, in the case of the *Presbyterian Church of York,* reported in 1 Watts & Sergeant, 1.

The Rev. William L. Tarbet, in speaking of the consequences of a withdrawal by a vote of the majority, says, the majority being justly entitled to their proportionable share of the church property before their withdrawal, and having made no cession of the property, either to the presbytery with which they were connected, or to the minority with whom they were in christian fellowship, and who still remain in connection with their presbytery, he cannot see how their withdrawal from the presbytery should divest them of their just title to that which was their own. In harmony with the

general customs, laws and usages of the Old School Presbyterian Church, they are justly entitled to share in an equitable and proportionate division of the church property, not, however, to the exclusion of the minority, who, like themselves, are entitled to an equitable division of the property.

The Rev. Robert W. Patterson, of Chicago, gives his views at large, and very sensibly remarks, as some of the other witnesses have done, that the ecclesiastical rights of a church are not to be confounded with its pecuniary or property rights. The presbytery may properly recognize an adhering minority of a church under its care, when the majority have withdrawn, without the consent of the presbytery, as the church in ecclesiastical succession. But the question to whom the property belongs in such a case, is to be settled by principles of equity and law, which are not affected by presbyterial consent or dissent. If the property of an Old School church was acquired while the church was in connection with the Old School denomination, it would probably be held, by most Presbyterians, that such property could not be equitably carried away from that connection, by a mere majority vote, against the remonstrance of a minority of the church, and this, because of the presumption, that the parties who contributed for the purchase of the property, did so, for the purpose of establishing a church in that particular connection. He thinks the case would be different, when the property was acquired before the church entered the Old School connection, and has left its original denomination without any stipulation or definite understanding as to the conditions on which the property should be held after the transfer of ecclesiastical relation. He thinks the reasonable presumption, in such case, would be, that the congregation had, by common consent, waived the purpose of holding the property for a specific denominational use, and had, for prudential and general reasons, united with another denomination representing the great principles which it was their purpose to sustain and advance, when the property was acquired. He refers also to the opinion of Chief Justice Gibson in the *York Presbyterian Church* v. *Johnston*, 1 Watts & Serg., and says

it is approved by competent judges of law and equity, in the Old School Presbyterian Church. He is of the opinion also, that the consent of parties, or of the whole church, to decide by vote, whether or not the church should withdraw from the presbytery, and join another body of Presbyterians, implies an agreement, and moral obligation on the part of the minority, to submit to the decision of the majority, whatever may be said of the right of the majority to act without such consent. He is not aware that the civil or moral right of a church to change its relation from one Presbyterian body to another, by unanimous consent, has ever been called in question in the former history of this denomination. Since the division, in 1838, many churches have transferred their relation from one branch of the church to the other, both ways, without any prejudice to their property or claims.

He also, as the others who have testified on behalf of defendants in error, deems it essential to Protestant freedom, that each church should be allowed to change its ecclesiastical relation, by mere consent of its members, provided, that in so doing, it disregards no stipulation into which it has entered, and perverts no property from the general purposes for which it was acquired.

In these statements the Rev. Z. M. Humphrey, and the Rev. J. Ambrose Wight, express their full concurrence.

The record further shows, that on the 4th of April, 1862, a communication was received by the Sangamon Presbytery from Mr. De Mottos, through Dr. Bergen, dated March 28, 1862, notifying the presbytery of his withdrawal therefrom. A committee having been raised to inquire into this matter, on the 3rd of April, he again addressed the presbytery, and, apologizing for the abrupt character of his first letter, asked to be dismissed to the Presbytery of Illinois, which request the Sangamon Presbytery refused.

The old committee, appointed in April, 1858, of which the Rev. Mr. Jennings was a member, and who, in his testimony hereinbefore quoted, he said was not discharged, reported that they had learned from the session of the Portuguese Church at Jacksonville, that at the time of the secession, the Rev.

Mr. De Mottos, and the elders who went with the seceders, retained and took with them the sessional records of that church; whereupon, the committee instructed the session, that the records belonged to the church session, and if they should regain possession of the records, it would be their duty to erase from the roll of communicating members, the names of those persisting in secession, and were not at liberty to recognize the secession as the Free Portuguese Church of Jacksonville, by giving any of their members letters dimissory, to the secession, nor by any other act; that all who were disposed to return to the church should be encouraged; that should any of the leaders of the secession apply to be restored, they should be required to make suitable acknowledgment of their offense, as a condition of their restoration, and that all should cherish and manifest a spirit of meekness, forbearance and humility towards all opposers. The report concluded with the recommendation that this resolution be adopted, which was done: "Whereas it has come to the knowledge of this presbytery, that the sessional records of the Portuguese Church (Free Portuguese), Jacksonville, were, at or about the time of the secession from said church, in May, 1858, retained by the Rev. Mr. De Mottos and the seceders, for the use of said seceders; and whereas the said Mr. De Mottos is still a member of this presbytery, and amenable thereto, inasmuch as said presbytery has not consented to his withdrawal; therefore *Resolved*, that the said Rev. Mr. De Mottos be and he is hereby required to deliver, without unnecessary delay, said sessional records to John Jacinto, or some other elder of said church, now acting therein and recognized by this presbytery."

We have now stated the substance of all the facts, opinions, arguments and inferences of the many intelligent witnesses who have been examined in the cause, whereby it will be seen, whilst the ministers of the Old School Presbyterian Church are of opinion that, by the constitution, laws, usages and customs of the Presbyterian Church, a congregation, attached to one of its presbyteries, cannot withdraw therefrom, without the consent of their presbytery, those of the

New School are equally decided, in view of the same constitution, laws, usages and customs, that any church can withdraw from its presbytery without consent, and that this privilege is essential to Protestant freedom. All concur, that the withdrawal must be by a majority vote, and the vote taken with the consent of the congregation. In regard to what the consequences may be, as to the rights to property, upon such withdrawal, opinions differ ; the majority agreeing that it depends on the title by which it is held, and the purposes for which it was acquired.

The points of difference apparent in the testimony we shall not comment upon, nor shall we attempt to decide which party has the legal title to this property, as we are not satisfied, on the proofs, of the perfect fairness of the vote alleged to have been taken on the question of withdrawal. There is room for much doubt on that point, and as the title to the property would seem to depend, in a great degree, on that vote, we ought to be entirely satisfied before we make it the basis of our decision, or give it that weight the defendants in error claim for it. We shall, however, admit that the defendants in error now represent the majority of the church, but we cannot admit that they are, therefore, entitled to the exclusive ownership and use of the church property. We must believe, the minority, large in numbers, have rights in it, which a court of equity should respect; that they should not be harshly dealt with, or be made to feel, that for their adherence to what they conscientiously believed to be a religious obligation, they justly incurred a forfeiture.

Whilst we will decide nothing affecting the ecclesiastical rights of a church, which we are not competent to do, its civil rights to property are subjects for our examination, to be determined in conformity to the laws of the land, and the principles of equity.

We have looked into the case referred to by the Rev. Mr. Hale, and the Rev. Mr. Patterson, in 1 Watts & Serg. 1. It was an ejectment, brought by the trustees of the English Presbyterian congregation, of the borough of York, against James Johnston and others, to recover a church and two acres

of land, in that borough. The plaintiffs claimed under a deed from the heirs of William Penn, and a charter of incorporation by the State of Pennsylvania.

The deed conveyed the land to three persons named in it, in trust, " for and as a site for a house of religious worship, and a burial place for the use of the said religious society of English Presbyterians, and their successors, in and near the said town of York, etc., to be forever at the disposal, and under the care, regulation and management of the said religious society and their successors, in and near the town of York aforesaid," etc. The congregation having agreed upon certain articles and provisions, as the terms of their incorporation, chose certain persons as trustees, and were incorporated by the name, style, and title of the " Trustees of the English Presbyterian Congregation in the Borough of York."

The suit was brought in the name of the corporation, at the instance of a minority of the congregation, who, having withdrawn from its stated worship in the church building, insisted that the majority had forfeited their corporate rights by dissolving the connection with the Presbytery of Carlisle, and the primitive General Assembly. In other words, had joined the " New School."

Chief Justice Gibson, and a majority of the court were of opinion that by withdrawing from the Carlisle Presbytery, the majority had forfeited no right to the property. That it was not stipulated in the deed, the church should belong to any particular presbytery—no such condition was expressed or implied, and that whilst the majority conformed, as nearly as it could, to the principles of its original faith, it lost none of its rights. Before it could lose them, it must swerve from its original, and embrace hostile, tenets. He admits, that a subjection to a particular judicatory may be made a fundamental condition of a grant, and when that is shown, abjuring the particular judicatory would forfeit the property.

He says also, even without an express condition, it might be a breach of the compact of association, for the majority of a congregation to go over to a sect of a different denomination, though it were different only in name. For instance, the

majority of a congregation of seceders, could not carry the church property into the Presbyterian connection, though these two sects have the same standards and plan of government. The opinion concludes, by saying, that no particular Presbyterian connection was prescribed by the founders (the deed), or established by the charter; and that if such connection had been prescribed, there has been no adhesion to a connection essentially different, and that the breaking up of the original Presbyterian confederation, (alluding to the division in 1838), has released this congregation from adhering to any particular part of it, in exclusion of another.

In this case the court say, it may be demanded, to what is the minority of a dissentient congregation to appeal? The answer is, To the justice and forbearance of the association, whose very object is, to deal justly, love mercy, and walk humbly, it is supposed the minority cannot appeal in vain.

In this case, the equitable rights of the parties could not be adjusted—the strict legal right only, as derived from the deed and charter, could be inquired into. In the case before us, the deed declares no trust, although executed to certain persons designated therein, as trustees of the Portuguese Free Church, located in the town of Jacksonville, and to their successors in office. We have held in the case between these parties (23 Ill. 459), that the plaintiffs in error were the duly elected trustees of the church, and therefore the successors in office of the original grantees. The fact insisted on by the defendants in error, that, since the separation they have been elected trustees, therefore they are the lawful successors in office of the first grantees, only shows that each party has elected its own trustees, and does not change the aspect of the case, as we view it.

We find no case approaching in its facts any nearer this case than the one cited. We have been referred to others, decided by the courts in New York and New Jersey, the facts in all of which differ essentially from the facts of this case, and their statutes are peculiar.

The case of *Curd et al.* v. *Wallace et al.*, 7 Dana (Ky.) 190, has been cited, as similar to this.

That case arose out of the conflicting claims of two separate societies of professing Christians to the use of a house of worship, called the Mount Vernon meeting-house, erected by the voluntary contributions of persons in its neighborhood, and dedicated by them to "the benefit of the Baptist society, but free for all gospel preachers invited by any of the subscribers, on days not occupied by them."

A Baptist church, organized in the neighborhood, called "The Church of Christ," took possession of the house, and continued to use it as a house of public worship, until, the number of the members having largely increased, dissension sprung up, some of the congregation, John Curd and twenty others having become "Campbellites," or "Reformers," some were expelled, and others seceded and organized a new society, and having appointed one of their number their pastor, they claimed and attempted to enjoy an *equal use* of the meeting-house. This claim being resisted, the matter was referred to the arbitration of two gentlemen selected by the parties, who decided that as neither of the churches was, in their opinion, a "Baptist Society," according to the understanding of those who built and dedicated the house, at the time of the dedication, neither of them had any legal right to the occupancy of it, but they nevertheless awarded that as each of them contained members who were original subscribers, and heirs of such subscribers, each should occupy the house an equal portion of the time, alternately.

The old church being dissatisfied with this award, as not within the terms of the submission, they, by their trustees, Wallace and others, filed a bill in chancery against Curd and the others, as the trustees of the new church, to set aside the award, and to enjoin the new church from disturbing the old church, in the exclusive enjoyment of the house.

The Circuit Court perpetually enjoined the new church; and they appealed.

It is only necessary to examine one of the grounds of decision in the Court of Appeals.

In Kentucky there is a statute, enacted in 1814, which provides, if any schism or division shall take place in a congre-

gation or church, from any other cause than the immorality of its members, nothing in the act shall be so construed as to authorize the trustees to prevent either of the parties so divided, from using the house or houses of worship for the purposes of devotion, a part of the time, proportioned to the number of each party; and that nothing contained in the act should be construed to authorize the minority of any church, having seceded from, or been expelled, or excommunicated from the church or congregation, from interfering in any manner in their appointments for preaching or worship, with any appointments for similar purposes which may have been made by the body or the major part of such church or congregation.

The court, in deciding the case, say, as the property was dedicated since that enactment, the remedy of the defendants in error must, in some respects, be considered subject to these provisions, and the Circuit Court had no right to give relief beyond the measure prescribed by the proviso; whereupon they reversed the decree, and remanded the cause, with instructions to the Circuit Court to decree that the plaintiffs in error, and the church which they represent, be enjoined from using, or attempting to use, the meeting-house, otherwise or oftener than shall be consistent with the exclusive right of "the Church of Christ," or old church, to use it according to its own appointments, to be made in such a manner as to leave to the new church, in good faith, so much of reasonable time as shall correspond with the ratio of its number of constituent members, as composed from time to time of seceding members of the old church, to that of the elder and then major church; and the new church be also enjoined from disturbing "the Church of Christ," or old church, in the peaceful enjoyment of the exclusive use of the meeting-house, according to the appointments which they might make.

The court divided the use of the church.

The case of *Shannon et al.* v. *Frost et al.*, 3 B. Monroe, 253, decides that a conveyance of real property to a church vests in each member so long as he or she shall continue such, and no longer, and that excommunicated members have no

such interest therein, as will authorize them to maintain a suit in relation to it.

The case of *Gibson et al.* v. *Armstrong et al.,* 7 id. 481, has some bearing on the case before us.

This was a contest between two portions of the former congregation of members of the Methodist Episcopal Church at Maysville, each claiming, as a distinctly organized society or congregation, the exclusive use and control, for the purpose of worship, of the church building.

The deed under which both parties claimed, was executed in 1812, for the consideration of fifty dollars paid to the grantor, and conveyed to five named trustees and their successors forever, a certain designated lot of ground in Maysville, upon the trust that they would erect on it a house of worship for the use of the members of the Methodist Episcopal Church in the United States of America; and in further trust and confidence that they would at all times permit such ministers belonging to that church, duly licensed, to preach therein.

The court held that the grantor in the deed was not the donor of a charity, but the vendor of land for a consideration paid, and therefore, the estate could never revert, though the Methodist Episcopal Church should cease to exist; but the use belongs to the local society worshiping at that place, unless forfeited by a departure from the conditions of the deed.

The court further held, in case of a division of the local society, each claiming the use of the house, their rights must be decided by the rules of the church, in which they could find no right, in a separating minority, to claim the use against the majority maintaining the original organization. They further held, that the deed secured the use of the pulpit to such ministers of the Methodist Episcopal Church as should be designated by the General Conference, or under their authority, and to none other; and in case of division in the local society, the branch of the divided church receiving the minister from the appointing authority recognized by the society, is to be recognized as the organization entitled to the use of the pulpit under the deed.

The division in this church, it appears, was into the Methodist Church "North," and Methodist Church "South," one portion receiving a preacher from the northern and the other from the southern organization, and each claimed the exclusive use of the church property in controversy.

The decree was in favor of the Methodist Episcopal Church South, the court holding, as the church had a right to separate, so each local church had a right to determine by a majority to which division it would adhere, and having determined to adhere to the Methodist Episcopal Church South, the ministers furnished by that organization, and those adhering to that connection, had the right to the exclusive use of the church property; the minority having, by their assent to the vote, and submitting the question to the decision of the majority, acknowledged the legitimacy of the mode of determination by a majority, were estopped to deny the authority of the tribunal to which they submitted, and having separated from the majority, they had no right to the use of the property for any portion of the time for religious purposes.

The case was decided upon the deed, no regard being had, by the court, to the proviso in the act of 1814, for the court say, this proviso was not intended to control the operation of deeds, or affect permanently the rights of beneficiaries in deeds for church property, or restrict the powers of courts of equity in ascertaining and enforcing the rights, according to the true intent of the deeds conferring the rights. The proviso was intended to prevent the trustees, in cases of schism, from excluding either party from the church, or from expelling them by an action at law ; but did not prohibit either party, being beneficiaries, from an application to the Chancelor, for the establishment of their right against other claimants under the deed, which the court is bound to do.

This decision deprived the portion of the church adhering to the Methodist Episcopal Church North, of any use whatever of the building and property, and we cannot but regard it as a harsh decision. When the Methodist Episcopal Church of the United States separated into North and South—(a fearful omen of what has transpired since in the nation

itself)—a division of their property was made, and neither party was robbed by the other. This principle, it seems to us, should have governed that case, and an equitable partition had, or a sale ordered, and a division made of the proceeds. We cannot regard the decision, able and profound as it is, as binding upon this court.

We believe, with Dr. Breckinridge, Messrs. Barnes, Watson, Patterson and Tarbet, that whatever may be the ecclesiastical right of a church, or a portion of a church, to sever its connection with a particular presbytery, with or without its consent, it does not follow, that the majority in so acting, become entitled to the property of the church, to the exclusion of the minority. Their rights still remain, and should be adjusted on the principles of equity. They had an interest in the property before the division—they were as much the beneficiaries under the deed as the majority, and as it is insisted, the majority had a right to withdraw from the presbytery, so the minority had a right to adhere to it. Neither act, on the principles of the case cited, worked a forfeiture of the rights of either, to the church property, because, in neither case has an illegal act been done. It may with truth be said, that as the majority did not forfeit its rights to the property by withdrawing from, so neither did the minority by adhering to, the presbytery. The congregation were, before the separation, the beneficiaries under the deed, and we see no reason why they are not so still. The proceeds of the property ought, therefore, to be divided between them, in the proportion which the seceding and adhering members of that congregation bear to each other in point of numbers. This will protect the rights of all parties, and is manifestly equitable and just, and is in accordance with the opinion of Chief Justice Gibson, in the case relied on, as we understand it, and in harmony with the views of the distinguished divines we have specially named. Neither party obtains an advantage over the other, and neither party, in the language of Dr. Breckinridge, " robs " the other. Justice should be done to both parties, and the equitable powers of this court, to that end, should not be invoked in vain. We are well

satisfied, this unpleasant controversy should be settled on this basis. Neither party has the exclusive right to the property of this church. Justice, good conscience and equity demand a partition of it, among these contestants.

The fact urged by the counsel for the defendants in error, that they have contributed, if it be so, the largest part of the money towards the acquisition of this property, can have no controlling influence, since, when the donations were made, they became the property of the church in which all its members have an interest. It cannot be claimed now, that those who paid the most money, have, on that account and for that reason, the greatest interest in the property.

To carry out these views, the decree of the Circuit Court is reversed, and the cause remanded to the Morgan Circuit Court, with instructions that the master in chancery of Morgan county ascertain, without delay, by competent testimony, the description and value of this church lot and edifice, and then, what number of persons composed the Free Portuguese Church on the 17th of May, 1858, as members thereof, and also how many of the same adhered to the Sangamon Presbytery, and how many of the same withdrew therefrom. And the said Circuit Court will order a sale of the lot and church edifice by the master in chancery, at public auction, at the door of the said church, after giving four weeks notice in some public newspaper printed in Jacksonville, of the time, place and terms of sale; the sale to be on a credit of twelve months, sufficient security to be taken for the purchase-money, and a deed executed to the purchaser. Either party will be permitted to bid at the sale. The purchase-money, when realized, shall be divided between the parties in the proportion herein indicated. Each party will be required to pay one-half the costs of this suit.

Separate opinion by Mr. Chief Justice Caton:

As a matter of law, as I understand the decisions, the rule is, that where a church is erected for the use of a particular denomination, or religious persuasion, a majority of the members of the church cannot abandon the tenets and doctrine of

Ferraria et al. *v.* Vasconcellos et al.

the denomination, and retain the right to the use of the property; but such secessionists forfeit all right to the property, even if but a single member adheres to the original faith and doctrine of the church. This rule is founded in reason and justice, and is not departed from in this case.

Church property is rarely paid for by those alone who there worship, and those who contribute to its purchase or erection are presumed to do so with reference to a particular form of worship, or to promote the promulgation or teachings of particular doctrines or tenets of religion, which, in their estimation, tend most to the salvation of souls; and to pervert the property to another purpose, is an injustice of the same character as the application of other trust property to purposes other than those designed by the donor.

Hence it is, that those who adhere to the original tenets and doctrines for the promulgation of which a church has been erected, are the sole beneficiaries designed by the donors; and those who depart from and abandon those tenets and doctrines, cease to be beneficiaries, and forfeit all claim to the title and use of such property. These are the principles on which all these decisions are founded; and so long as we keep these principles distinctly in view, we can have no great difficulty in applying them to the facts of each particular case, when the facts are once clearly ascertained.

The facts of this case are peculiar, and differ from all of the cases referred to; yet the principles above stated are no more difficult of application than in ordinary cases. Which of the contestants has incurred a forfeiture of the right and use of this property by abandoning the tenets and doctrines, the faith and the organization anciently proposed, when this church was erected and paid for? This cannot be said of the minority, who adhere to the Presbytery of Sangamon, for they have not changed a hair. They adhere to the ancient faith and doctrines, and adhere to the connection with the presbytery, which had been lately formed by the consent of all, and which they had a right to form without the violation of any trust or confidence reposed by the donors. Certainly, then, they had incurred no forfeiture. How is it with the

others who withdrew from the connection with the presbytery, who constituted a bare majority? They, too, did only what the proof shows they had a right to do. It was no violation of the trust reposed, for them to withdraw from the ecclesiastical control of the superior body, and assume the free and independent position which this church occupied when the donations were made and the building erected. In resuming this old position there was certainly no perversion of the fund from the design contemplated by the donors. They, then, have incurred no forfeiture by thus withdrawing from the presbytery.

In a case thus peculiar in its facts, differing as it does from all others which we find reported, where neither party has incurred a forfeiture, we are to apply the rules of equity, and a sound morality. This can only be done by a division of the property, where the members of the church have thus become divided in numbers nearly equal.

We would not be understood that such a division should be made where one party or the other consisted of a single member, or but a very few members, for then the minority might be considered as acting obstinately or perversely; but where, as in this case, the numbers are nearly equal, there is propriety in recognizing the rights of each.

Mr. Justice WALKER: I understand that neither of these opinions conflicts with the previous decisions of this case when formerly before this court, and therefore concur in the judgment announced.

*Decree reversed, and cause remanded.*