HARRY C. ADAMS, Appellant, *vs.* THE FIRST M. E. CHURCH
OF IRVING PARK *et al.* Appellees.

*Opinion filed October 25, 1911.*

1. WILLS—*effect of judgment denying probate because of existence of later will.* The judgment of the probate court allowing or disallowing probate of any will is final and conclusive unless reversed on appeal, but where probate is denied because of the existence of a later will the judgment is not conclusive if the later will is set aside.

2. SAME—*when complainant has such interest as enables him to contest a will.* Where two wills of different dates are presented for probate and the earlier will is denied probate because of the existence of the later will, which is admitted to probate, the chief beneficiary of the earlier will has a substantial interest, which enables him to maintain a bill in the circuit court to set aside the later will.

3. SAME—*trustees, pastor and members of church are competent witnesses.* The trustees, pastor and members of a church which is a beneficiary under a will stand on a different footing from stockholders of a corporation or members of a beneficiary society as they acquire no personal or private interest in property bequeathed to the church, and hence they have no such interest in the result of the suit as precludes their testifying in favor of the will.

4. SAME—*witnesses should not be asked whether there was any fraud, duress or undue influence.* It is error to permit witnesses in a will contest case to give their conclusions as to whether there was any fraud, duress or undue influence used to induce the testatrix to sign the will; but such error will not justify a reversal, where the witnesses testified in detail as to every occurrence at the time of signing the will, so that the jury must have inevitably agreed with their conclusion that they had no knowledge of any fraud, duress or undue influence being used.

5. SAME—*when effect of relation of pastor and parishioner is of no importance.* The effect of the relation of pastor and parishioner is of no importance where the bequest is not to the pastor but to the church, in which he has no financial interest, and where the evidence is clear and conclusive that the will was not obtained by any influence or improper means but was the voluntary act of the testatrix and the result of her deliberate judgment.

6. SAME—*when the presumption in favor of sanity must prevail.* To justify a finding of insanity the evidence must preponderate in favor of unsoundness of mind, and the presumption of sanity

must prevail if the evidence is only sufficient to raise a doubt as to such sanity.

7. The court reviews the evidence in this case, and holds that the verdict finding the will in question was the will of the testatrix is in accordance with the clear preponderance of the testimony, and that the testatrix was capable of transacting business and disposing of her property by will.

APPEAL from the Superior Court of Cook county; the Hon. ARTHUR H. CHETLAIN, Judge, presiding.

BENSON LANDON, for appellant.

FRED H. ATWOOD, and FRANK B. PEASE, for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Annie S. Adams, of Irving Park, in Cook county, died on December 16, 1908, leaving both real estate and personal property. She left no child nor descendant, and her heirs-at-law were a brother and sister living in Massachusetts. Two wills executed by her were presented to the probate court of Cook county. One was dated September 9, 1904, by which she gave all her property except the family portraits to her step-son, the appellant, Harry C. Adams. The other will was dated February 29, 1908, and, after disposing of the family portraits, gave $1000 to Mary A. Dicey if she should be living in the house of the testatrix at the death of the testatrix, and gave the remainder of the estate to the First M. E. Church of Irving Park, stating that the testatrix was a charter member of the church and had been a member for nearly twenty years. On January 19, 1909, the court refused probate of the first will and admitted to probate the one of later date. The complainant filed his bill in the superior court of Cook county setting forth facts which would show the first will to be valid when made, and charging that the testatrix, at

the time of the execution of the later will, which had been admitted to probate, was not of sound mind and memory, and that the instrument was the product of undue influence exercised by members of the church. The bill was answered and replications were filed and an issue was formed for trial by jury. The jury returned a verdict finding the paper dated February 29, 1908, to be the will of Annie S. Adams. The court overruled a motion for a new trial and entered a decree in accordance with the verdict.

The first question to be determined is whether the complainant had a right to file the bill. The court decided that he had, and the ruling is questioned by a cross-error. The statute authorizes any person interested to contest the validity of a will by his or her bill in chancery, and if the complainant was interested, within the meaning of the statute, he had a right to file his bill. It is not denied that he would have had such a right but for the order of the probate court denying probate of the will in his favor. Counsel say that he should not have presented the will for probate, or should have withdrawn his petition or had it continued until the validity of the later will was finally adjudicated, or appealed from the decision of the probate court. We do not see how his position would have been any better if he had taken either course suggested. Probate of the first will was denied because there was a later will revoking all former wills, and until the later will should be set aside it would have been useless to appeal. The judgment of the probate court on the merits in allowing or disallowing any will to probate is final and conclusive unless reversed on appeal, (*In the Matter of Storey,* 120 Ill. 244,) but where probate is denied because of the existence of a subsequent will the judgment is not conclusive if the subsequent will is set aside. The case of *Bardell* v. *Brady,* 172 Ill. 420, was the same, in principle, as this, and it was not there considered that the probate of the revocation and setting aside of the probate of the will

deprived the parties claiming under the will of the right to contest the revocation by a bill in chancery. The circuit court could not admit either will to probate, the exclusive original jurisdiction for that purpose being in the probate court. (*Beatty* v. *Clegg,* 214 Ill. 34.) But the circuit court did have jurisdiction to set aside the second will, which revoked the first one. The complainant had a substantial interest in the subject matter of his bill, and the court did not err in the ruling.

The court permitted a number of members of the church to testify on behalf of the defendants, against objections of the complainant on the ground of interest in the result of the suit. Stockholders of business or moneyed corporations are directly interested in the result of a suit involving the title of property claimed by the corporation, because such property would increase their dividends or lessen their legal liabilities. (*Albers Commission Co.* v. *Sessel,* 193 Ill. 153.) So, also, members of a beneficiary society bound to contribute to the payment of its liabilities have a direct, personal, pecuniary interest in the result of a suit concerning a liability. (*Cronin* v. *Royal League,* 199 Ill. 228.) Members and trustees of churches or charitable institutions and societies occupy a different position. The connection of members with a church is purely voluntary and they have no personal or private interest in the property of the church. Contributions of members are voluntary, and the church may appropriate its property to any proper use and cannot impose any legal liability upon the members. As the trustees, pastor and members do not obtain any right to property bequeathed to a church they are competent witnesses. (Greenleaf on Evidence, sec. 333; *Warren* v. *Baxter,* 48 Me. 193; *Loring* v. *Park,* 73 Mass. 42; *Sorg* v. *First German Congregation,* 63 Pa. 156; *Trapnall* v. *Burton,* 24 Ark. 371.) In *Ferraria* v. *Vasconcellos,* 31 Ill. 25, the court held that under the peculiar facts of that case the property of the church should be divided between two fac-

tions according to their numerical strength, but did not hold that it was to be divided among the individual members, or that they had any individual pecuniary interest in the property based upon the amounts contributed or any other theory. The court did not err in permitting the witnesses to testify.

There were four subscribing witnesses to the will, and all of them testified in detail to its execution and the circumstances connected therewith and gave opinions that the testatrix was of sound and disposing mind and memory. Three of them were asked this question, "Was there any fraud, duress or undue influence used to induce Annie S. Adams to sign her name to that instrument?" The complainant objected to the question, but his objection was overruled and each one answered that there was none so far as he knew, or that he did not know of any. The court permitted these witnesses to put themselves in the place of the jury and give their conclusions as to an ultimate fact which the jury had been sworn to try, and the ruling was wrong. (*Schneider* v. *Manning,* 121 Ill. 376; *Baker* v. *Baker,* 202 id. 595; *Pyle* v. *Pyle,* 158 id. 289; *Wetzel* v. *Firebaugh, ante,* p. 190.) An attempt is made to justify the decision of the court because of the statutory provision relating to the probate of wills that upon certain proof the will shall be admitted to probate, provided that no proof of compulsion or other improper conduct be exhibited which to the probate court shall be deemed sufficient to invalidate or destroy the will. That provision affords no justification for the ruling, and does not substitute the judgment of subscribing witnesses for the conclusion of the court or jury from the facts and circumstances proved. The statute provides that the certificate of the oath of the witnesses at the time of the first probate shall be admitted as evidence, in a contest, to have such weight as the jury shall think it may deserve, and in *Baker* v. *Baker, supra,* such a certificate was introduced, which contained, among other

things, the same question propounded to the witnesses in this case. The only question raised there was whether the certified transcript of the testimony given in the probate court was admissible, and the court held that it was, although it gave the proponents the benefit of the same witnesses testifying twice. No objection was made to the particular question and there was no ruling concerning it. If there had been any testimony or fact or circumstance tending to prove fraud, undue influence or duress when these witnesses were present at the time of the execution of the will the error would be serious, but each witness went into particulars as to every occurrence at the time of the signing of the will, and the conclusion that they did not know of any fraud, undue influence or duress at that time was a necessary one from what they had already testified to. The inevitable conclusion in the minds of the jury would have been that the witnesses did not know of anything of that kind, and permitting them to state the fact would not justify a reversal. *Chicago City Railway Co.* v. *Saxby,* 213 Ill. 274.

It is contended that the verdict was contrary to the weight of the evidence. Thirty witnesses who were acquainted with the testatrix and had an opportunity to form an opinion as to her mental capacity testified to her mental soundness. A number of witnesses had done business with her, and six of them had been her tenants during the four years previous to her death. The witnesses included physicians who had attended her, and there was the further testimony of two expert medical witnesses. There were seven witnesses who gave testimony that she was not of sound mind and memory and detailed circumstances upon which their belief was founded. Our conclusion as to the facts has been reached by reading all of the testimony of the witnesses, from which we find the following facts: The testatrix had been married more than once, and in 1886 came with her last husband, Henry E. Adams, to Irving

Park to live. He had a son, the complainant, Harry C.
Adams. She acquired several pieces of real estate, on
which she built houses. In 1888 she took part in the or-
ganization of the First M. E. Church and continued a mem-
ber until her death, on December 16, 1908. Her husband
died in 1902, and she afterwards sold all of the real estate
except the house in which she lived. In 1904 she converted
that house into two apartments, continuing to live on the
first floor and rented the upper floor of the house to a ten-
ant, the tenant for the last year being Mary A. Dicey, who
occupied the upper floor with her son and mother and took
care of the furnace and assisted the testatrix at different
times. Prior to 1905 the testatrix attended the Sunday
morning service of the church regularly and the class meet-
ing and prayer meeting about half the time, but a few
years before her death she became afflicted with rheuma-
tism, principally in her knees, which made it impossible for
her to attend the church or the social meetings connected
with it. The step-son, Harry C. Adams, lived in Chicago
and occasionally visited the testatrix and assisted her to
some extent in her business. On September 9, 1904, she
made the first will, giving him practically all of her estate
and appointing him executor, and their relations continued
to be friendly up to the time of her death, although she
complained some of his not visiting her. In later years she
became very deaf and used an ear trumpet but could hear
quite well over the telephone. In January, 1908, a new
building of the church was nearing completion, and in the
latter part of that month she sent word to the pastor that
she wished to see him. The church was dedicated on Feb-
ruary 16, 1908, and on that day two of the trustees called
on her to solicit a subscription, but she refused and said
she intended to do something for the church later on, and
asked them to tell the pastor that she would like to see
him. The pastor had not responded to her request but a
few days after the dedication he called, when she told him

that she had been thinking for some time of making a will
in which she would leave some money to the church. The
pastor asked for twenty-four hours to think the matter over
and returned the next day, when she said she was of the
same mind. He suggested that it would be a nice thing
to remember her relatives in order that they might think
kindly of her after she was gone, but she said they did not
need the money. She gave him the name of the attorney
who had drawn the former will and said she would like
to have him draw this will. About five days afterward the
pastor saw that attorney and arranged with him to call on
her. The attorney called and she gave directions for the
will, by which Mrs. Dicey, who was living in the house
and assisting her, was to have $1000 provided she was liv-
ing in the house when the testatrix died, and the rest was
to be given to the church. The attorney drew the will and
a copy was sent to the testatrix, and she found an error
in the provision concerning the family portraits, which was
corrected. The will was finally executed on February 29,
1908, when she was about seventy-six years of age, and a
copy was given her, which she retained. In the last few
years of her life she became very quarrelsome about bills
and accounts and became very vulgar and profane with
reference to those she had dealings with. She quarreled
with the milkman about the amount of milk he had fur-
nished and disputed the amount of many accounts against
her. In March, 1908, she had a severe rheumatic attack of
the grip, lasting about two weeks, and had a nurse who
was not a professional and whom she called hard names,
such as "hussy" and "muttonhead," with profane additions.
The doctor who attended her had been in the habit of
charging a dollar and a half a visit but had raised his price
to two dollars, and made his bill accordingly. She did not
know of the change and insisted upon a reduction, and
called him a robber, thief and beggar. The doctor reduced
the bill, and she was successful, in general, in getting some

kind of a reduction by her disputes. She accused a mechanic of carrying off some window screens and charged the nurse with eating some of her food, both of which charges were untrue. Generally she did her own housework up to the time of her death, with occasional assistance from Mrs. Dicey. Her statements show that she had in mind her relatives and their relation to her, and she was a good business woman. She had a furious temper, and was avaricious and greedy about securing the highest price for her property which was wanted for a school. The complainant assisted her some, but in the main she attended to her own business, giving receipts for rent, personal orders for repairs, orders for coal and other necessities. She settled her bills and paid them, executed a release, arranged for extensions of loans and for a change in the telephone. It is quite clear that she was capable of transacting, business and of disposing of her property by will.

It is argued that there was a confidential relation existing between the testatrix and the pastor and trustees of the church. Such a relation exists between a priest or spiritual adviser and his parishioner, (*Dowie* v. *Driscoll,* 203 Ill. 480; *Gilmore* v. *Lee,* 237 id. 402;) and if the priest or spiritual adviser receives a gift from the parishioner the burden is upon him to show the absence of undue influence, but the pastor has no financial interest in the church or the church property, and in this case the will conferred no benefit upon the pastor. The effect, if any, of the relation is of no importance, since the evidence was clear and conclusive that the will was not obtained by any influence or improper means but was the voluntary act of the testatrix and the result of her deliberate judgment. The verdict was not contrary to the evidence but was in accordance with the clear preponderance of the testimony.

Complaint is made that the court instructed the jury that if there was only evidence sufficient to raise a doubt of the sanity of the testatrix the presumption in favor of

sanity must prevail. That is the law. (*Myatt* v. *Walker,*
44 Ill. 485; *Taylor* v. *Pegram,* 151 id. 106; *Wickes* v.
*Walden,* 228 id. 56.) To justify a finding of insanity the
evidence must preponderate in favor of unsoundness of
mind. But counsel construes the instruction as meaning
that the complainant was bound to remove, by evidence, all
doubt of the sanity of the testatrix, and that so long as
there remained a doubt the presumption of sanity must
prevail. That seems to us to be reversing the meaning of
the instruction. The jury would understand that a mere
doubt is not sufficient to establish insanity, as against the
presumption of law that all persons are sane.

Objections are also made to instructions in which a
part of the hypotheses of fact was that no fraud, undue
influence or improper conduct, as defined in the instruc-
tions, was used to cause the testatrix to execute the will.
The objection is, that the jury were limited to facts and
circumstances mentioned in the instructions and were not
allowed to consider other facts and circumstances proved.
The instructions did not state facts and circumstances but
gave to the jury general rules as to what constitutes fraud,
undue influence or improper conduct, and the reference to
such conduct as so defined was not improper.

It is also urged that some instructions separated differ-
ent elements by isolating facts and directing the jury that
each separate fact was not sufficient to overthrow the will,
which was held improper in *Weston* v. *Teufel,* 213 Ill. 291.
The instructions only stated general rules which have been
frequently endorsed by this court, and they are not open to
the objection.

We find no error calling for a reversal of the decree,
and it is affirmed.                         *Decree affirmed.*