Happy et al. *v.* Morton et al.

## W. H. HAPPY *et al.*
## *v.*
## JOSEPH MORTON *et al.*

1. TRUSTS — *chancery jurisdiction.* Courts of equity will exert their powers to prevent a misuse or an abuse of charitable trusts, and especially trusts of a religious nature, by trustees or by a majority of a society having possession of the trust property.

2. PERVERSION OR ABUSE OF A TRUST — *equity will interfere only in a clear case.* But in all cases, in order to invoke the interposition of a court of equity, the trust and the abuse of it must be clearly established in accordance with the rules by which courts are governed in administering justice. If the alleged abuse is a departure from the tenets of the founders of a charity, their particular tenets must be stated, that it may appear from what tenets the alleged wrongdoers have departed. In like manner it must be stated in what the alleged departure consists. Courts of equity do not interfere on account of inaccuracies of expression or inappropriate figures of speech, nor for departures from mathematical exactness in the language employed in inculcating the tenets of donors. There must be a real and substantial departure from the purposes of the trust; such an one as amounts to a perversion of it, to authorize the exercise of equitable jurisdiction in granting relief.

3. PLEADING *taken most strongly against the pleader.* When the aid of a court of chancery is sought upon the ground of an alleged abuse of trust, everything

will be intended to have been lawful and consistent with the trust, which is not expressly shown on the bill to have been unlawful or inconsistent with it.

4. CORPORATIONS — *whether individual rights pass to the corporation.* When a majority of an unincorporated religious society organize as a corporation under the general law, the rights and interests of the individual members in the property held by the original society are thereby transferred to the corporation; but an organization in opposition to the majority creates a new society, and has no effect upon individual rights and interests in the old one.

5. EVIDENCE — *opinions of witnesses.* The mere opinions of witnesses are not admissible as evidence of historical facts. Courts are frequently required to ascertain facts from history, but they consult its authentic sources and ascertain such facts from them and not from the opinions of witnesses.

Nor will the opinions of witnesses be taken as evidence of a departure from the faith of the church by the preacher and those sustaining him.

Where it is sought to show that a minister is preaching doctrines essentially variant from those recognized by the church, courts should be exceedingly careful in giving a construction to a few detached sentences taken from the preacher's sermon, expressed in highly figurative language, and they ought not to be interpreted as inculcating a doctrine contrary to the faith of the society, if they are susceptible of any other meaning.

APPEAL from the Circuit Court of Morgan county; the Hon. W. M. WOODSON, Judge, presiding.

This was a suit in chancery instituted in the court below by Joseph Morton and others, against Walter S. Russell, W. W. Happy, and others, for the purpose of securing to the complainants, and those represented by them, the use and ownership of the church edifice and other property belonging to a religious society organized at Jacksonville, in the year 1832, known as the "Church of Christ."

The complainants, and those whom they represent, comprise but a minority of the original society, and had become organized under the general law providing for the incorporation of religious societies.

The grounds upon which the complainants claim the right to the property, to the exclusion of the defendants, who constitute a majority of the original organization, consist in an alleged departure from the faith and doctrines of the "Church of Christ," in the teachings and administrations of the Rev. Walter S. Rus-

sell, the pastor of the church, and in the support of said Russell, and an adherence to his views by the other defendants.

The true faith and doctrine, as they are claimed to be, and the alleged departure therefrom, are set forth in the original and amended bills.

It is stated in the bill that the members attached to and forming said church held to the faith as taught by the reformation, a prominent leader of which was Alexander Campbell; the members of which said reformation have since been called Christians.

That the Rev. Walter S. Russell, who has been the preacher in charge, occupying the pulpit of said church since his admission into the same in August, 1858, does not hold to, or believe in, nor has he, since that time, held to or believed in the Bible doctrines as taught by the christian church throughout the United States. That said Russell does not profess to hold theological views in harmony with the tenets and teachings of the christian church, nor in harmony with those adhered to by the founders of the "Church of Christ" in Jacksonville, at the date of its original organization, and adhered to by them from that time to the present. That those who have followed the said Russell in his false and erroneous doctrines do not nor does the said Russell profess to hold to the original faith of said "Church of Christ." That William W. Happy is and has been prominent in support of said Russell, and has for a long time been a member of said church and a preacher of the gospel. That he and others, who support said Russell and his teachings, have abandoned the faith of the original founders of said "Church of Christ."

This is the substance of the allegations contained in the original bill, respecting the faith of the church and the departure therefrom on the part of the defendants. But the complainants, by way of amendment to the original bill, set forth in a more particular manner the grounds of their claim, as follows: That when the "Church of Christ" was organized, and up to the time of the erection of the church edifice mentioned, the said church had never adopted or agreed to any *written* creed, covenant or confession of faith; nor has said church ever done so, or ever

held or believed that it was right or admissible for them to do so; but said church was founded and established on the ground and doctrine that the Bible, and the Bible alone, is the all sufficient and only rule of faith and practice, and the only allowable creed, and the word of God, as therein contained and set forth, is the sword of the Spirit, through which the spirit of God operates in the conviction and conversion of sinners, and preparing them to believe and obey the gospel, and for fellowship in the church after obedience; and that men and women, on reading the gospel and hearing it proclaimed, are able to believe and obey it, and were responsible for so doing. That the Almighty God had, in His word, as written and recorded in the Bible by prophets, apostles and evangelists, done all that was necessary on His part, and that all those to whom that word was proclaimed were able and bound to receive, believe and embrace it, and that no person had any right to wait for, or expect the spirit of God to operate on his mind or heart by any special operation or direct action, other than through the word, to produce in him faith or repentance, or a disposition to obey.

It is further alleged in the amended bill, that the said church, at its establishment, and ever after, until the arrival amongst them of the said Walter S. Russell, and the propagation by him of different doctrines in said church, always held, received and believed the doctrines as above set forth, as a fundamental doctrine of the church, and as being the doctrine to be taught on that subject in the church, and one of the main and fundamental principles essential to a true and correct teaching and practice; a doctrine uniformly held and taught in that particular church, as well as in all the other churches with which they were in fellowship, and for which, as a distinguishing doctrine, they were held and deemed to be heretical by most christian denominations around them.

The complainants further charge that it was also a fundamental doctrine of said church, operating both before and after admission to church membership, that the gospel, as it was written by the prophets, apostles and evangelists, was to constitute the rule of faith and practice. That all were bound to

believe and obey it as written, and that it was not in any part, or any of its precepts, injunctions, revelations or promises, to be enlarged or diminished, altered, amended, varied, explained or interpreted by any supposed revelations made at any time since to the individual or to any other, by any supposed direct operation of the Holy Spirit on the mind or heart of any individual, or any supposed inner light or promptings of any agency acting internally, or invisibly and inaudibly. And the said church held this, as well as the foregoing, as fundamental in the church, and vitally important as part of the doctrine that the Bible alone was the only and all sufficient rule of faith and practice, and was to be taught as it was written, and was not to be endangered by permitting it to be expounded, added to, diminished, interpreted, perverted, or in any wise altered by or in consequence of any inward impressions or delusive imaginings of excited emotions or supposed communications from invisible or inaudible sources or assumptions of direct revelations from the spirit of God to the individual.

It is alleged that it was the teaching and propagating and enforcing the foregoing as well as other vital doctrines, and for the worship of Almighty God, that said church was organized and the building erected, and not for the purpose of having taught, enforced or propagated therein, doctrines directly opposite to those above set forth, and contradictory thereof, and contrary to what they believe to be the express teachings and commandments of the holy oracles.

The amended bill further charges that at the times the defendants employed said Russell to take charge of said church as their pastor, and continued him against the remonstrances of those for whom the complainants are trustees, and during the time of his ministration as such, he has continually, with the approbation and consent of the other defendants, taught, advanced and advocated views directly hostile to the doctrines hereinbefore set forth as the doctrines on which the "Church of Christ" was originally founded and maintained in Jacksonville, to wit: The said Russell holds and teaches that "in addition to the indirect means by which God influences man through

the facts, exhortations and warnings of God's word, the Spirit exerts a present and immediate influence upon the heart of the sinner by his personal presence to convince him of sin, righteousness and judgment, aids him in obeying, enlightens him and regenerates and renews him, in order that he may become a child of God;" and "that in addition to the preaching of the word, the Spirit enlightens the sinner in order that he may realize the gospel declarations-in their full force."

Also, that "when the Spirit is declared to do this or that, the primary significance of such language is, that the Spirit accomplishes whatever is predicated of him in his own person, and by his personal presence without the intervention of secondary instrumentalities." And that "the written or spoken word, (meaning the word of God) is the indirect method of reaching man through the lower understanding in order that the direct means, the Spirit, may be able to come into action." And also, speaking of the Holy Spirit, "that this name is used because of the office of enlightener to be exercised by the Spirit; as Spirit, he will communicate the very essence of truth, instilling into souls the profoundest realization of it. Formal declarations in words and precise terms might communicate a logical apprehension of what was true, but the Spirit of Truth, for the very reason that He is spirit, actualizes truth as a life within the soul, and communicates to the stirred heart the realization of, and insight into, the divine wisdom, which it could receive from no source short of the essential presence of God. Only when the spirit of wisdom and revelation is bestowed, can the 'eyes' of the understanding be so enlightened, that the Christian may know what is the hope of the calling of the Lord Jesus Christ, and what the riches of the glory of his inheritance in the saints, and what the exceeding greatness of his power to the believer." And again, "let us not detract from His (meaning the Spirit's) mission; it is not to call the exact words of Christ to memory, but his very thoughts are reinspired in the soul, and guided into innumerable ramifications of reflection and expression; they are led forth into new channels, and moulded by the plastic Spirit into a thousand new forms of beauty and power. It is owing

to this ever living Spirit of Truth that the gospel never becomes a dead gospel. Its thoughts are not fossilized in forms of eighteen centuries ago, to be carefully handled now just in the shapes with which they were born. Humanity is ever changing, presenting new obstacles to the truth; having new difficulties to be overcome, and special wants to be supplied. Hence, an ever abiding divine teacher is required to be always personally present with men." And again, "you cannot know fully, indeed, what is the true doctrine of the Spirit, until you have this experimental realization within you to guide you in your inquiries, and give you personal means of observation."

It is further alleged in the amended bill, that the said Russell teaches that "it was a generic law of christianity, that the Spirit should be bestowed in such measure on every believer, as to confer together with the results of conviction and sanctification, miraculous power; and where all these effects did not appear, the fault was in humanity, and not in the divine law. Such outpouring of the Spirit was not a special matter confined to a few individuals, but it was preëminently the characteristic of a new dispensation, and, consequently, every individual fulfilling in himself the conditions of admission into the kingdom, received power from on high, to demonstrate his citizenship to the world." And again, "even so it is in reference to God. Only the Spirit of God knows the thoughts of God. No revelation in words can communicate them."

All which doctrines and teachings of said Russell, the complainants allege, are in direct hostility to the fundamental doctrines on which said "Church of Christ" was founded, and are a manifest departure and change from said fundamental doctrines.

They further aver that this departure is not in the construction or understanding of what the Bible contains, but consists in calling in revelations and ramifications, additions, &c., by some concealed impulse in aid of the words and teachings of the Bible.

A second amended bill was filed, relating to certain conversations alleged to have been had with Mr. Russell, but have no bearing upon the real questions involved in the case.

These are the grounds upon which the complainants seek to recover. The defendants filed their answers, and voluminous proofs were taken on both sides, which it is unnecessary to set forth, as the facts, as assumed by the complainants in their pleadings, are taken as the basis of the discussion by the court of the various questions involved in the case.

The court below rendered a decree in favor of the complainants, and granted the relief prayed for in their original bill. From that decree the defendants below took this appeal.

The questions considered by the court are: *First.* Of the jurisdiction of courts of equity to prevent the misuse or abuse of trusts of a religious nature. *Second.* Of the character of case in which that jurisdiction may be asserted, and herein, whether the case made by the original and amended bills, will authorize the court to interpose. And, *Third.* Of the effect of an organization of a majority, or of a minority, of a religious society, as a corporation, under the general law on that subject, upon the individual rights of the members in the property held by the original society.

Messrs. I. J. KETCHUM and D. A. & T. W. SMITH, for the appellants.

Messrs. MORRISON & EPLER and S. T. LOGAN, for the appellees.

Mr. JUSTICE BECKWITH delivered the opinion of the Court:

In the year 1832 a religious society was formed at Jacksonville, called by its members the Church of Christ, and the association has been maintained from that time to the present, during which the number of its members has largely increased, and many of them have departed this life. It was never organized under our statute providing for the incorporation of religious societies. The society elected its own preachers and officers, and was the sole judge of their qualifications, and was not subordinate to any other society or ecclesiastical body, but in every respect an independent association, subject to no authoritative

discipline or reproof except such as might be self-imposed. In the year 1835 its members and others favorable to its prosperity, contributed the sum of two hundred and fifty dollars for the purchase of a lot of ground on which to erect a house for public worship. The purchase was made and the land conveyed to certain persons by name for the use of the so-called Church of Christ. A house of worship was erected thereon by the members of the society, which remained there and was used by them for several years. In the year 1850 the society purchased another lot of ground adjoining the one which they first purchased, which was also conveyed to certain persons by name for the use of the so-called Church of Christ. The society disposed of a part of the lands thus purchased, and upon the remainder erected a new house of public worship, the old one being removed. The land purchased in 1850 and the new house of worship were also paid for by contributions from members of the society and others favorable to its prosperity.

About the first of September, 1857, the Rev. Walter J. Russell commenced preaching to the society, and he continued his ministrations, under yearly elections, up to the time of his death, which took place in 1863, since the commencement of this suit. In August, 1860, a minority of the society, composed of the complainants and those whom they represent, organized a new society under the statute providing for the incorporation of religious societies. The members of the new society thereafter declined to attend the meetings of the old one, alleging that the Rev. Mr. Russell and a majority of its members had departed from the faith held by the society when it was formed. After various unsuccessful efforts to reconcile the differences between the parties, the complainants, as trustees of the new society, composed of a minority of the old one, filed a bill in chancery against the Rev. Mr. Russell and certain persons representing the majority, alleging that he preached, and the majority of the old society sustained him in preaching, doctrines contrary to those of the society when it was formed, and when said property was acquired, thereby diverting its use from the purpose for which it was donated, and praying for its surrender to the com-

plainants, and that the defendants might be restrained from disturbing them in its use and occupation. Two amendments were subsequently made to the bill, more specifically setting forth the faith of the society and the alleged departures from it, which will be more particularly noticed hereafter. No critical examination of the jurisdiction of courts of equity over charitable trusts is necessary to dispose of the present case, and only some well established general principles will be referred to. Courts of equity will exert their powers to prevent a misuse or an abuse of charitable trusts, and especially trusts of a religious nature, by trustees or by a majority of a society having possession of the trust property; but in all cases the trust and the abuse of it must be clearly established in accordance with the rules by which courts are governed in administering justice. If the alleged abuse is a departure from the tenets of the founders of a charity, their particular tenets must be stated, that it may appear from what tenets the alleged wrongdoers have departed. In like manner it must be stated in what the alleged departure consists. Courts of equity do not interfere on account of inaccuracies of expression or inappropriate figures of speech, nor for departures from mathematical exactness in the language employed in inculcating the tenets of donors. There must be a real and substantial departure from the purposes of the trust, such an one as amounts to a perversion of it, to authorize the exercise of equitable jurisdiction in granting relief. Taking these well established rules as our guide, we are required to dismiss from our consideration a large portion of the voluminous record in this case. The original bill alleges that the property in question was purchased for the purpose and with the intention of erecting thereon a suitable building for the use of the society called the Church of Christ, in which to worship Almighty God according to the teachings of the Christian or Reform Church; but it does not allege what the teachings of the Christian or Reform Church were, nor in what particulars these teachings had been departed from.

It is true, the bill alleges that the society at Jacksonville, from its original organization, continued for a time in harmony

and union with all the brotherhood of the Christian church through the United States as to theological views and teachings, and as to church government and discipline, but it does not allege what the theological views and teachings of the brotherhood throughout the United States were, nor any trust that the worship in the church at Jacksonville should continue in harmony and union with such views and teachings, nor in what particulars such views and teachings have been departed from. An elemental principle of pleading requires us to intend everything to have been lawful and consistent with the trust, which is not expressly shown on the bill to have been unlawful or inconsistent with it. *Foss* v. *Harbottle*, 2 Hare, 502. The defects of the original bill were attempted to be supplied by two amendments, which allege that the society at Jacksonville was founded and established upon certain doctrines specifically set forth, which were held by its members when the property in question was purchased. For convenience, we shall state these alleged doctrines in a numerical order: First, that the Bible, and the Bible alone, is the only sufficient rule of faith and practice, and the only allowable creed. Second, that the word of God, as therein contained and set forth is the sword of the spirit, through which the Spirit of God operates in the conviction and conversion of sinners and preparing them to believe and obey the gospel and for fellowship in the church after obedience. That men on reading the gospel, or hearing it proclaimed, are able to believe in its precepts and obey its commands, and are under obligation so to do ; and that no person has any right to wait for or expect the spirit of God to operate on his mind or heart by special operation or direct action other than through the word, to produce in him faith or repentance, or a disposition to obey. Third, that the gospel as it was written by the prophets, apostles and evangelists, constitutes the rule of faith and practice ; that all are bound to believe and obey it as written, and that no part of it nor any of its precepts, injunctions, revelations or promises are to be enlarged or diminished, altered, varied, explained or interpreted by any supposed revelation made at any time since to the indi-

vidual or to any other, by a direct operation of the Holy Spirit on the mind or heart of any individual or any supposed inner light, or promptings of any agency acting internally, or invisibly and inaudibly. Fourth, that the Bible alone is the only and all sufficient rule of faith and practice, and is to be taught as it was written, and is not to be endangered by permitting it to be expounded, added to, diminished, interpreted, perverted, or in anywise altered by or in consequence of any inward impressions or delusive imaginings of excited emotions or supposed communications from invisible or inaudible sources, or assumptions of direct revelations from the spirit of God. Fifth, that the society had always, prior to the Rev. Mr. Russell's ministrations, rejected the mourner's bench as a mere human device and mischievous in its tendency; but it is not alleged that its rejection was to be taught as an article of faith, nor that such a bench was ever used in the church, nor that the teachings of Mr. Russell were in favor of the use of one. The allegations of the second amendment, so far as it is material to notice them, consist of alleged remarks of Mr. Russell in private conversation between himself and two other gentlemen, which are not alleged to be a part of his teachings to the society, and which we are therefore required to intend were not a part of them, and that they in no way affected the use of the property in question. These are the only specific allegations in regard to the faith of the society, and whether consistent with each other or not are to be taken as a whole, and when so considered we are asked to declare that the teachings of the Rev. Mr. Russell were a substantial departure from such alleged faith. No departure whatever is alleged from the first article of the faith, nor any substantial departure from the fifth article, as we have enumerated them. We are required to take the allegations of the bill as the standard of faith, and the specific teachings of Mr. Russell as the evidence of departure, and in determining the questions thus presented for our consideration we cannot consider the mere opinions of witnesses. They may have had in their minds an entirely different standard of faith from the one alleged in the bill, or they may not have properly construed the language employed by Mr.

Russell. We cannot judicially declare that the alleged departure has taken place from such opinions, however honestly entertained. We must have facts from which we can arrive at a conclusion of our own. A *striking* illustration of the necessity of adhering to this rule is presented in considering the alleged departure from the second article of the society's faith. The allegations of the bill in regard to it do not assert that the society held that the Holy Spirit is not ever personally present to the minds and hearts of men, but that the spirit has no special operation or direct action upon them other than through the word. By the rules of construction governing us we are to intend that the society admitted the general operation and indirect action of the spirit, independent of the word. The term " word " is an ellipsis of the term " word of God," a figure of speech used to denote the books of the Old and New Testaments. It is evident that the language of those books has no meaning except as it represents ideas. As originally written in the Hebrew and Greek, they have no meaning and convey no ideas to those entirely unacquainted with those languages. The allegation of the bill that the word of God is the sword of the spirit we understand to mean the ideas which it represents are the sword; and the allegation that the spirit operates through the word of God, we understand to mean that the spirit operates through the ideas which the word of God represents. The bill does not allege the society held that the word of God produces or is of itself sufficient to produce faith, repentance and a disposition to obey, independent of the influence of the spirit; and as we are required to construe its allegations, it admits that the Holy Spirit is a *separate* and independent agency or power operating upon men's minds and hearts to produce those results, but limits the channel through which its special operation or direct action takes place, to the ideas represented by the written word, held and comprehended by men. It asserts the society held that no such action or operation takes place until the mind becomes possessed to some extent of the ideas represented by the written word; and it admits that when the mind has to some extent become possessed of such ideas, that the Holy

Spirit has a special operation and direct action through them. We understand that the Rev. Mr. Russell was preaching to and teaching men and women who, from their earliest infancy, had more or less knowledge of the written word. They had to a greater or less extent become possessed of the ideas represented by it. His teachings do not inculcate the doctrine that the Holy Spirit specially and directly operates upon the minds and hearts of men who had never heard of the written word and had no ideas concerning it. His language was not addressed to or used with reference to that class of men. From the bill, then, we understand the society held as a fundamental doctrine that the Holy Spirit, in its special operation and direct action upon men's minds and hearts, operates and acts only through those ideas represented by the written word which are held and comprehended by men; not otherwise defining the time, manner or extent of its action in producing faith, repentance and a disposition to obey. The teachings of the Rev. Mr. Russell, where his language is construed with reference to the class of persons to whom it was addressed, are not inconsistent with the faith of the society as alleged in the bill. He taught that the Holy Spirit had a special and direct action upon the minds and hearts of men, producing with and through the ideas represented by the written word, faith, repentance and a disposition to obey. We have not undertaken to define the true faith of the complainants. We state it as they have stated it in their bill, construing its allegations as we are required to construe them, and before this court can declare the teachings of the Rev. Mr. Russell in this regard an abuse of the trust in question, the complainants must show a distinction between such teachings and their standard of faith, so that a difference can be perceived. The witnesses, when they speak of a departure from the faith of the society in this regard, have no reference to the standard of faith alleged in the bill as we construe its allegations, but refer to their own ideas of the faith, and then give their opinions that the teachings of Mr. Russell were a departure from such ideas. Similar considerations apply with equal force to the alleged departure from the third article of the society's faith, alleged to be that no part of the

Bible, nor any of its precepts, injunctions, revelations or promises are to be enlarged or diminished, altered, amended, varied, explained or interpreted by any supposed operation of the Holy Spirit upon the minds or hearts of men, but it is not alleged that the Rev. Mr. Russell ever assumed to enlarge, diminish, alter, amend, vary, explain or interpret any part of the Bible, or any of its precepts, injunctions, revelations or promises by any such means. It is, however, asserted that he taught that others might do so, contrary to the third article, and in express violation of the fourth article, requiring the opposite doctrine to be taught. The evidence of the teachings of Mr. Russell in this regard are certain extracts from his writings set forth in the bill, the meaning of which the defendants say is misunderstood and grossly perverted. The defendants emphatically deny that any such doctrine as the complainants deduce from these extracts has ever been held or taught. We are required to scrutinize the language employed and define its true meaning. Our experience admonishes us that we should be exceedingly careful in giving a construction to a few detached sentences expressed in highly figurative language, and we ought not to interpret them as inculcating a doctrine contrary to the faith of the society, if they are susceptible of any other meaning. The language employed by Mr. Russell does not necessarily mean that the truths of God's holy word, which are unalterable and unchangeable, were to be altered, diminished, amended or varied by His Holy Spirit. He was speaking of the influence of the Holy Spirit in removing error and prejudice from men's minds, and in inclining their perverse hearts to love and obey the Savior. He taught that when the mental blindness occasioned by error and prejudice was removed, that his hearers could more clearly realize that which they intellectually apprehended and understood before; that when the heart was sincerely inclined to love and obey the Savior its emotions were changed, which gave rise to new thoughts and expressions corresponding to such a change, and he brought his congregation to seek divine assistance in the removal of those errors and prejudices, and to incline their affections to love and obey their Lord and Savior. We are unable to

perceive that their teachings necessarily inculcate the doctrine that God's holy word is to be expounded, enlarged or explained contrary to the faith of the society, and it is worthy of remark that no one of the thirteen reverend gentlemen who were examined as witnesses in this case, familiar as they were with the extracts in question, and many of whom heard the discourses from which they are taken when they were delivered, ever considered them as inculcating a doctrine which was departure from the third and fourth articles of the faith of the society. A departure which was not noticed by any of the congregation could not have been a very serious one. The language used by Mr. Russell is highly figurative, but it is susceptible of an interpretation consistent with the faith of the society; and it would be manifestly unjust to construe it as meaning something different from what his congregation understood it to mean when it was used.

Another insurmountable objection to granting the relief sought by the complainants, is their want of title to or interest in the trust property. The bill is brought in behalf of a corporation which never had any right to or interest in the property. The members of the new society may have had individual rights and interests when it was organized under the statute, but their individual rights and interests did not pass to the corporation, and cannot be asserted by it. An organization, under the statute, by a majority of a society, operates as a transfer of the rights and interests of individual members to the corporation thereby created, but an organization in opposition to the majority creates a new society, and has no effect upon individual rights and interests in the old one.

Notwithstanding these objections to granting the relief sought by the complainants, we have carefully examined the evidence with reference to the true faith of the society at Jacksonville when the property in question was purchased. The only witness for the complainants who professes to have any actual knowledge in regard to it, is John T. Jones. The other witnesses for the complainants have given their opinions in regard to the historical fact. Courts are frequently required to ascertain facts

from history, but they consult its authentic sources, and ascertain such facts from them, and not from the opinions of witnesses. The mere opinions of witnesses are not admissible as evidence of historical facts. No one of the complainants' witnesses, except Mr. Jones, had any knowledge of the faith of the society when it was organized, nor for nineteen to twenty-five years afterwards. In the year 1832, most of them were children, from six to sixteen years of age. Two of the witnesses examined by the defendants were members of the society at the time of its organization, or from about that time; another has been a member since the year 1839, and another a minister of the denomination for upwards of thirty years. From the testimony of those witnesses who were acquainted with the faith of the society when it was organized, it appears that prior to that time there were two societies in Jacksonville — one called the Christian Church, holding the views advocated by Barton W. Stone, and the other called the Reformers, holding the views advocated by Alexander Campbell. The views held by these two societies were different in some particulars, and the same differences existed between them as now exist between the parties to the present controversy. The views of the one society were then esteemed to be directly opposed to those of the other. These two societies united, with the understanding that the members should tolerate each other's views. All parties understood that the society thus formed was not to have any creed, written or unwritten, other than the Bible, which, it was claimed, was so clear and explicit in its meaning, in all essential matters, as not to require any interpretation. There is no evidence that the society agreed to any particular view of the operation of the Holy Spirit, and from the circumstances under which the two then existing societies united in forming a new one, it is evident it was understood that no particular view on that subject should be considered as an article of faith. Historically, we know that the distinguishing feature of the sect was the rejection of all human creeds. Its members held that a sincere belief in Jesus as the Christ, the Son of God, was the only faith which could be lawfully demanded in order to admission to christian privi-

leges and church fellowship, and the only creed to which any one could be justly called upon to subscribe. All other creeds and confessions were repudiated, as without divine authority, and mere inventions of men. We also know, from the published writings of leading members of the sect, that no theories in regard to the particular mode in which either the word or the spirit accomplished the divine purpose were regarded as articles of faith. They were considered as matters of opinion about which men might differ without any just cause or occasion of disunion. It was urged in argument that the Rev. Mr. Russell had insisted upon his peculiar views to the exclusion of those opposed to them; and that such exclusive inculcation of his views was intolerance towards those who entertained different views. The bill does not allege any breach of trust on that ground, nor any facts requiring an investigation of that subject. The Rev. Mr. Russell was not required to preach doctrines which he did not believe to be true; and the majority of his congregation were not required to vacate the common place of worship in order that some one might preach to the minority in accordance with their views. Mr. Russell considered his views essential, and undoubtedly he told his congregation that he so considered them, but they were not made a test of church membership or fellowship. We are not informed how often nor of the manner in which Mr. Russell expressed his views, further than that he entertained and expressed certain opinions differing from those of the minority. It does not appear that any member was ever reproved for not entertaining the views of the majority, and it would illy enforce the spirit of toleration existing when the society was formed to deprive the majority of their interest in the trust property, for not holding and expressing opinions in accordance with those of the minority. We are unable to perceive any substantial merits in the complainants' case, and the decree of the court below will be reversed and the bill dismissed.

*Decree reversed.*