THE GERMAN EVANGELICAL LUTHERAN TRINITY CONGRE-
GATION OF THE UNALTERED AUGSBURG CONFESSION,
ETC., Appellant, *vs.* DEUTSCHE EVANGELISCH LUTH-
ERISCHE DREIEINIGKEITS GEMEINDE UNGEAENDERTER
AUGSBURGISCHE CONFESSION, ETC., *et al.* Appellees.

*Opinion filed October 28, 1910.*

1. CHURCHES—*equity will not permit perversion of trust upon which property is held.* Where church property is held in trust for the use of the members of the congregation who adhere to the articles of faith as prescribed in the written constitution a court of equity will not permit a perversion of the trust, and in case of a disagreement and division of the congregation as a result of a departure from the faith so prescribed, the portion of the congregation adhering to the faith are entitled to the property, whether they are in the majority or minority.

2. SAME—*when minority of congregation cannot compel a partition.* The minority of an incorporated religious society whose "supreme power and government in the management of all its inner and outer affairs" is vested in the congregation, cannot, because of mere dissatisfaction with the action of the majority in the lawful management of the society's affairs within its constitution and rules, withdraw from the congregation and compel a partition of the property, there being no departure from the articles of faith by either faction. (*Ferraria* v. *Vasconcellos,* 31 Ill. 25, and *Niccolls* v. *Rugg,* 47 id. 47, distinguished.)

3. SAME—*minority must submit to majority in mere matters of management.* Where the constitution of an incorporated religious organization vests the supreme power and management of the affairs of the church in the congregation, the minority are bound to submit to the lawful action of the majority in matters of management, direction and control of the temporal affairs of the organization, and mere dissatisfaction on the part of the minority is not ground for interference by the courts, in the absence of any abuse by the majority of their powers or denial of the minority's rights.

4. SAME—*injunction is proper remedy to restrain unlawful interference with church property.* Where the location of a church is lawfully changed by a majority vote of the congregation of an incorporated religious organization in accordance with the constitution and rules of the organization, the minority are not entitled to take possession of the abandoned church site and erect a

new building thereon for their own use without the consent of the organization, and they may be perpetually enjoined from so doing and from incorporating as a new religious organization under the name of the old organization translated into another language.

CARTWRIGHT and HAND, JJ., dissenting.

APPEAL from the Circuit Court of Will county; the Hon. CHARLES B. CAMPBELL, Judge, presiding.

In the year 1848 a religious organization was formed in the town of Crete, Will county, Illinois, at a place called Beebe's Grove, under the name of "Zion Lutheran Church," and a church building was erected.   In 1855 another religious congregation was formed at Black Walnut, in said town of Crete, under the name of "St. John's Lutheran Church," and a church house was also erected.   In 1858 the two congregations were consolidated and adopted the name of "Trinity Congregation."   In 1860 the congregation was incorporated under the name of "The German Evangelical Lutheran Trinity Congregation of the Unaltered Augsburg Confession, in Crete, County of Will, and Vicinity."   A new church was erected on a tract of land known as "Cole acre."   The deed conveyed the title to this tract of land to the trustees and their successors in office, and contained a clause to the effect that the property was to be held in trust for such members of the congregation, no matter how few in number, as should adhere to the unaltered articles of the Lutheran faith as prescribed in and by the written constitution of the congregation then in force, and that it should be used for no other purpose. Subsequent to the organization of the church certain other real estate was acquired, which at the time of the trial of this suit in the lower court consisted of two church sites, upon one of which there was a church house; a six-acre wood lot; three school houses and certain church and school equipment, the real and personal property being worth in all about $20,000.   The schools were known as

the Crete, Beebe's Grove and Black Walnut schools, and the property upon which the school buildings stood was owned and controlled by the congregation. Cole acre, on which the church house stood before its removal, as hereinafter stated, is located about three-fourths of a mile south of the center of the village of Crete. Until the fall of 1908 the congregation met on friendly terms and together worshipped their God in peace and harmony, according to the rites, doctrines and beliefs of their common religion. Prior to that time, however, there had been some discussion as to the advisability of moving the church building to a new location within the corporate limits of the village of Crete. This movement was favored by most of the residents of the village and a few living outside the village but was opposed by most of those living outside the village. The question was brought to an issue at a regular meeting of the congregation held September 20, 1908, when a motion to move the church was lost and the whole matter was laid over to a future meeting. An extra meeting was held in November, 1908, at which meeting the question of moving the church was undecided, whereupon the meeting was continued until two weeks later. At this meeting, which was held November 15, 1908, a vote was taken by ballot, which resulted in the motion to move being carried by a vote of seventy-six to fifty-six, and later the church building was moved to its new location. After the building was moved from the old site, the faction which opposed its removal refused to attend worship at the church in Crete and began preparations to erect a new building on the old site. For that purpose they hauled stone and building material and placed them on the lot. They further attempted to organize themselves into a religious corporation under the name of "Deutsche Evangelisch Lutherische Dreieinigkeits Gemeinde, Ungeänderter Augsburgische Confession, in und um Crete, Illinois," the same being a literal translation into German of the English name of the old congregation.

At the May term, 1909, of the circuit court of Will county, the society, in its corporate name, filed a bill of complaint, making those who had refused to affiliate with the society in Crete and who were preparing to erect a new church on the old site, defendants, and praying for an injunction to restrain the defendants from interfering with the control, use and possession of the property mentioned in the bill, and from using the name of "Deutsche Evangelisch Lutherische Dreieinigkeits Gemeinde, U. A. C., in und um Crete, Illinois," from going upon said premises and from building a church or other structure thereon or any part thereof. A temporary injunction was granted. A motion to dissolve the injunction was overruled, and defendants asked and were granted leave to file a cross-bill for partition. The cross-bill alleged the attempt of the society to incorporate in 1860 was ineffectual, and that it was not a religious corporation but merely an association of people banded together for the purpose of divine worship; that the church site on Cole acre was conveyed to certain persons and their successors in office as trustees for the congregation and all the members of the same adhering to the unaltered articles of the Augsburg Confession and of the constitution adopted by the congregation and now in force. The cross-bill alleged that the congregation had been governed ever since its organization by a constitution and by-laws adopted by it, which are still in full force and effect; that by said constitution and by-laws the congregation was given supreme jurisdiction and power in the government of all matters pertaining to the society; that the meeting at which it was decided to move the church house from the old site to the village of Crete was an illegal meeting and the proceedings had thereat were null and void; that after the removal of the church building cross-complainants took up the subject of incorporating as a religious society, which had been ineffectually attempted by the old congregation, and lawfully organized themselves into a religious corpora-

tion under the corporate name of "Deutsche Evangelisch Lutherische Dreieinigkeits Gemeinde, U. A. C., in und, um Crete, Illinois;" that it was not a new congregation but was the old society incorporated, and that the title to the real estate of the society vested in it; that cross-complainants were not secessionists from the old congregation but that the faction represented by complainant in the original bill were secessionists therefrom. The cross-bill alleged that cross-complainants had full right and lawful authority to erect a new church building upon the church property and hold religious meetings therein; that by the removal of the church, cross-complainants and their associate members had been deprived of a place of worship unless "they should further humble themselves by servilely following the other faction to the church at its said new location;" that if they should so humble themselves they would be put to great inconvenience and hardship and loss of time in attending worship. The cross-bill further alleged that in addition to the old church site the society owned other real estate and personal property; that cross-complainants were the rightful owners of all of said property but waived their right to the sole possession and ownership thereof and claimed the right to their proportionate share by way of partition, based upon the numerical strength of the two factions. The prayer was for partition of the premises, or the sale thereof and a division of the proceeds.

A demurrer to the cross-bill was overruled and issues formed by filing answers and replications. Upon a hearing the chancellor found and decreed that complainant in the original bill was duly organized as a religious corporation under the statutes of Illinois then in force, in May, 1860, under the name of "The German Evangelical Lutheran Trinity Congregation of the Unaltered Augsburg Confession, in Crete, County of Will, and Vicinity;" that it has since that time been actively engaged in the exercise of all of its corporate powers; that as such corporation it

acquired for religious and educational purposes a church building and certain other real estate and personal property, the title to which is in the trustees of the society and is held in trust for all the members who remain true to the doctrinal teachings and beliefs of the Lutheran religion as prescribed in the written constitution of the congregation. The decree further finds that the attempt of cross-complainants to organize themselves into a religious corporation under the same name but using the German translation, in order that they might succeed and be entitled to the control of the church and all its property, was ineffectual; that they had no right to use the name of the society already incorporated, translated into German, and perpetually enjoined such use of the name by cross-complainants. The decree further found that what is denominated therein as the "old site faction" did not, by attempting to incorporate and refusing to follow their brethren to the new church location, divest themselves of their right of membership in the congregation or their equitable share of its property; that neither of said factions was guilty of any unlawful act leading up to their disagreement; that neither was to blame therefor and that neither in equity forfeited any right or interest in or to the church property. The decree also found that in equity there should be a division of the property between the two factions; that the right to the use of the corporate name was in the "new site faction," and ordered a sale of the property by the master in chancery, and, after paying costs, solicitors' fees agreed upon between the parties, and $1000 to complainant in the original bill, (that being the amount paid by that faction for the removal of the church from the old site to the new site,) directed that the residue be divided between the two factions in proportion to their numbers,—eleven-seventeenths to the complainant in the original bill and six-seventeenths to the cross-complainants. The decree also directed that the money received by the respective factions from the sale of

the property should be expended in acquiring church sites, school sites, erecting churches and schools thereon, and in conducting divine services and teaching school in conformity with the doctrine, tenets, beliefs and practices of the Lutheran religion as heretofore adhered to by each of said factions. The injunction restraining the cross-complainants from trespassing or entering upon the property of the society was dissolved. From that decree complainant in the original bill, representing the "new site faction," has prosecuted this appeal.

S. J. DREW, for appellant.

LAGGER & BLATT, and WILLIAM H. TATGE, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

While controversies between factions of religious societies have frequently been the subject of litigation which has often reached courts of last resort, these controversies have usually arisen out of questions relating to religious beliefs, tenets and modes of worship. The controversy here under consideration involves no question of departure from faith or modes of worship by either of the factions. Both claim, and the proof sustains the claim, that they adhere to the doctrines, tenets and modes of worship adopted by the society at its organization and since then adhered to by it. The religious beliefs and doctrines of the society and the rules for the government of its affairs are set forth at length in a constitution adopted by the members of the society. The constitution provides that "the congregation, as a body, has the supreme power and government in the management of all its inner and outer affairs." The qualifications of members to vote in the management of the society's affairs are, that the member must be twenty-one

years of age and have subscribed to the constitution. At
the time the meeting was held at which it was decided to
move the church house from the old site to the village of
Crete there were one hundred and seventy-six voting mem-
bers of the congregation. One hundred and eighteen of
them lived in the village of Crete and fifty-eight outside the
village. One hundred and thirty-two voting members at-
tended the meeting. Seventy-six voted for the removal
and fifty-six against it, the vote being taken by ballot. Ap-
pellees in their brief argue that the meeting was not held
in accordance with the constitution and rules of the society
and that its action was illegal and void. The decree finds
that the meeting was "held and conducted in conformity
with the provisions of the constitution of said complainant
congregation * * * and that such removal was lawfully
accomplished." In our opinion this finding is sustained by
the evidence. Besides, appellees have assigned no cross-
errors and are in no position to attack the correctness of
the findings of the decree. The case, therefore, presents
the question whether the minority of an incorporated re-
ligious society, where the "supreme power and government
in the management of all its inner and outer affairs" is
vested in the congregation, can, because of dissatisfaction
with the lawful management of the society's affairs within
its constitution and rules, withdraw from the congregation
and compel a partition of the church property.

The chancellor decreed,—and we think correctly so,—
that the trustees of the complainant congregation, and their
successors in office, held the church property in trust for
the use of members of the congregation who adhere to the
articles of Lutheran faith as prescribed in and by the writ-
ten constitution of said congregation. This trust required
that the property should be devoted to the purposes of
teaching the doctrines and observing the forms of worship
prescribed by said constitution. A court of equity would
not permit a perversion of the trust, and if the disagree-

ment had resulted from a departure of a part of the congregation from the faith and modes of worship prescribed it would have amounted to a forfeiture of their rights in the property, whether they constituted a majority or a minority, and those adhering to the faith would have been entitled to the property. Here, however, there is no forfeiture, for there has been no departure from the faith and modes of worship prescribed by the constitution. The members of both factions retain their interest in the property of the society, and the minority refusing to affiliate with the majority and attend divine worship because of the removal of the church, seek to have the property sold and the proceeds divided.

Appellees rely on *Ferraria* v. *Vasconcellos,* 31 Ill. 25, and *Niccolls* v. *Rugg,* 47 id. 47, to sustain the decree. In both those cases the church property was directed to be sold and the proceeds divided between the factions. In the *Ferraria case* the religious society was organized, but not incorporated, under the name of "The Free Portuguese Church." It purchased a lot, taking the deed in the name of individual members of the society as trustees, and erected a house of worship thereon. Before coming to this country the members of the society were members of the Free Portuguese Church in the island of Madeira and were under the jurisdiction of the Free Presbyterian Church of Scotland. Four years after coming to this country and organizing the society they procured a dismissal from the presbytery of Glasgow and applied to and were received by the presbytery of Sangamon. This was by the unanimous consent of the congregation and occurred in 1856. A schism arose in the congregation in 1858 relating to the subject of baptism. Some of the members, before coming to this country, had been baptized by the Roman Catholic church and had not received any other baptism. The question arose whether, on accepting the Presbyterian faith, it was necessary for them to be baptized according to the

forms of that church. Some members of the congregation
had baptism administered according to the requirements of
the Presbyterian church and others refused to do so, believ-
ing the baptism they had received according to the forms of
the Roman Catholic church was sufficient. The controversy
was submitted to the Sangamon presbytery for decision
and that organization decided against the validity of the
baptism of the Roman Catholic church, but it accompanied
its decision with the declaration that as the society had
been organized before the presbytery's jurisdiction had at-
tached, the matter was not of sufficient importance to pro-
ceed with disciplinary measures, and christian forbearance
was recommended to be exercised by all the parties. The
pastor of the church refused re-baptism, called a meeting
of the congregation and submitted a proposition to with-
draw from the Sangamon presbytery. The proposition was
adopted by a vote of 105 for withdrawing to 101 against
it. Thereupon the doors of the church were closed against
the defeated faction and the majority faction took posses-
sion of the church and its properties and organized a con-
gregation with the former pastor as its head. Efforts were
made by the presbytery to settle the difficulties but these
efforts resulted in failure. The minority faction thereupon
proceeded to form a religious society in pursuance of the
provisions of the statute, under the name of "The Free
Portuguese Church," and filed a bill in chancery against
the majority faction in possession of the church edifice and
property, praying that it be restored to them as the legal
owners of the property. The court held the congregation
had a right, by majority vote, to sever its connection with
the Sangamon presbytery, and that the majority did not
forfeit its rights in the property by doing so and neither
did the minority adhering to the presbytery forfeit its right,
and it was held that the most equitable disposition that
could be made was to sell the property and divide the pro-
ceeds, which was accordingly ordered done.

The controversy in *Niccolls* v. *Rugg, supra,* which resulted in a division of the congregation, arose out of a difference of opinion between the members of the congregation as to whether the society should be connected with the old school or new school presbytery. It does not appear from the opinion in that case whether the society was incorporated or not. It was organized in 1833 as a Presbyterian body before that denomination divided into the old and new schools. That division occurred in 1838, and the society involved in the controversy attached itself to the new school organization in that year. In 1848 it withdrew its connection from that organization with the consent of the presbytery and joined the old school denomination and so remained until 1865, when a majority of the congregation voted to sever connection with the old school organization and return to the new school, and this was done. The minority, being discontented with the action of the majority, elected trustees and filed a bill claiming the property rightfully belonged to them. The court said there was no abandonment of faith or doctrine which the society was founded to support, by either faction; that the old and new school branches of the Presbyterian church adhered to the same doctrines and forms of government, and that withdrawing from one presbytery and attaching itself to another by the society was not a perversion of the trust and did not work a forfeiture of the property. The court said: "But inasmuch as the two branches of the church have distinct organizations and as the property has come from both, it is just that the majority shall be permitted to change the church connection without forfeiture, while the right of the minority to remain in the existing relations and retain their portion of the property should be equally recognized." It was held the trial court properly decreed a sale of the property and a division of the proceeds between the two factions.

It must be admitted, we think, that in the cases cited the court went to the extreme limit in exercising its equitable powers in the settlement of a dispute between contending factions of religious societies, but there were facts and circumstances in each of those cases that appealed more strongly to the equitable powers of a court than do the facts and circumstances in this case.    The rule announced by this and all other courts of this country, so far as we are advised, is, that courts have no power to pass upon questions of differences between contending factions of a church society unless civil or property rights are involved. They will not interfere to control the exercise of ecclesiastical authority not violative of a civil or property right. (*Fussell* v. *Hail,* 233 Ill. 73;   *Christian Church* v. *Church of Christ,* 219 id. 503;   *Kuns* v. *Robertson,* 154 id. 394; *Schweiker* v. *Husser,* 146 id. 399.)   Upon questions arising under the laws and usages of the church, the decisions of the church organization having power and authority to pass upon them will be accepted by courts as final, unless such decisions plainly violate the laws they profess to administer or are in conflict with the laws of the land.   In the case here under consideration we see no grounds for the interposition of a court of equity.   By the act of becoming members of the society appellees agreed to the rules provided for its government in temporal affairs, and mere dissatisfaction with the exercise of the authority of the organization does not authorize invoking the supervisory power of the courts.   Authority to manage the society's affairs vested in the congregation, and, necessarily, upon any question affecting the management, direction and control of its temporal affairs and property the majority must control. The faction represented by appellant constitutes the majority.   It had authority to move the church site, and that authority was exercised for that purpose in the regular and lawful manner.   It cannot be said to be an abuse of authority, for the new site in the village of Crete is only

three-fourths of a mile from the old site, and substantially two-thirds of the membership live in the village. It was not the purpose or intention of the faction represented by appellant to deny appellees any rights or privileges they enjoyed before the removal of the church, but the appellees were invited to continue their membership in the congregation and their worship in the church on the new site and the enjoyment of all their rights in the property the same as they had done before its removal. No change of faith, doctrine, modes of worship or rules for the government of the congregation were involved in the removal of the church to the new site. Both factions remained loyal to the old faith, tenets and modes of worship. The trial court found and decreed that the title to the church property is in the trustees of appellant and their successors in office, in trust for the members of the congregation who adhered to the unaltered articles of the Lutheran faith as prescribed in and by the written constitution of the congregation, and that the appellant faction had committed no act of forfeiture. The grievance of appellees is not that the appellant faction has usurped or acted without authority, but that they do not acquiesce in the government of the society's temporal affairs in the manner and by the authority which the society itself provided by a written constitution should govern it. The removal of the church site was a question calling for the exercise of the judgment and good faith of the congregation for what was to the best interests of the society. Those opposing its removal urged as grounds of opposition that it required the members living in the country to travel three-fourths of a mile further to attend church services. Those favoring the removal urged as a reason for it that the larger portion of the membership lived in the village of Crete, and that many of the women and children were without conveyances and were prevented much of the time from attending services three-fourths of a mile out in the country. Obviously,

which faction was right about this matter is not a question for a court to determine.

In *Happy* v. *Morton,* 33 Ill. 398, the court said, on page 407: "Courts of equity will exert their powers to prevent a misuse or an abuse of charitable trusts, and especially trusts of a religious nature, by trustees or by a majority of a society having possession of the trust property, but in all cases the trust, and the abuse of it, must be clearly established in accordance with the rules by which courts are governed in administering justice. * * * There must be a real and substantial departure from the purposes of the trust,—such an one as amounts to a perversion of it,—to authorize the exercise of equitable jurisdiction in granting relief." A collection of authorities sustaining this rule will be found in *Fussell* v. *Hail, supra,* and *First Presbyterian Church* v. *Cumberland Church,* 245 Ill. 74.

The application of the above rule to the facts in this case makes it clear that the case made by the cross-bill is not of the character courts of equity are justified in taking jurisdiction of. Nothing has been done by appellant to justify appellees in withdrawing from the congregation or refusing to affiliate in worship with appellant. Appellees contend that they have not seceded, and that their object in seeking to build a new house of worship on the old site is to provide a place of worship for the entire congregation. They declare they never can meet for worship in the church in the village with those who worship there unless they "humble themselves by servilely following the other faction into the church at its said new location." This they are not disposed to do, and ask a court of equity to partition the church property and give them their proportionate share of it. If they are entitled to this relief, the appellant faction, if it had been in a minority on the question of removal of the church building, would have had the same right to have had the property sold and its proceeds divided. Secession may seem a harsh term with which to characterize

appellees' conduct, but what they have done amounts, in effect, to a withdrawal from the appellant congregation and a repudiation of its authority, by whatever name the act may be characterized. Certainly the appellant faction has not seceded. If, under the facts and circumstances of this case, appellees have the right to cause the church property to be partitioned, then a minority disagreeing with the majority in the lawful management of the church affairs, from any cause whatever, may cause the property to be partitioned by a court of equity. A disagreement as to what color the church should be painted, or as to its interior decoration, or as to its heating system, and many other matters of business management not affecting the rights of the parties or the objects and purposes of the organization, would afford ground for asking for a sale of the property and there would be no stability to church organizations. To permit this to be done would place church property upon such a precarious basis as to in all probability greatly affect and hinder religious societies in acquiring property and building churches thereon.

We think there are some differences between this case and the *Ferraria* and *Niccolls cases, supra.* They may be thought to be shadowy and not of a controlling character, but an examination of the cases will show they exist, and under the conditions in those cases, which do not exist in this case, partition of the property was decreed. It was never intended, in our opinion, to lay down a rule in those cases that would warrant the relief asked by and decreed to appellees in this case. Here the society was incorporated and the management of its business and temporal affairs was committed by the constitution to the congregation. So long as that authority managed the affairs of the society in a lawful way and in accordance with the constitution, it was not in the power of a minority of the membership to have the property sold and the proceeds divided, any more than it would be in the power of minority stockholders in

a business corporation to have the property sold and the proceeds distributed because they were not in accord with the lawful management of the corporation by the majority. No rights of the appellees have been violated in this case. They have the same right in the property they had before removal of the church building, and no one is seeking to deny to them its enjoyment as fully and to the same extent now as they enjoyed it prior to the removal of the building. They can avail themselves of these rights and privileges if they choose to do so, but if they do not, because, as they say, they would be humbling themselves, they must be content to abide by the consequences of their own acts. Irreconcilable differences that authorize partition of the property mean something more than a mere disagreement about the location of the church house. *First Presbyterian Church* v. *Cumberland Church, supra,* is in point. That case involved a controversy over church property that had belonged to the Cumberland church before it was united with the Presbyterian church in 1906. The question of union between the two denominations was submitted by their respective assemblies to the presbyteries. Sixty Cumberland presbyteries voted for it and fifty-one against. The union was by the respective church authorities declared effected and the Presbyterian church proceeded to assume control and authority over the church property that had previous to the union belonged to the Cumberland congregation. A large number of the members of the Cumberland congregation refused to go over to the Presbyterian church and denied the validity of the union and the right of the Presbyterian church to take possession and control of the property. The court held the merger or union was effected in accordance with the laws and usages of the two church denominations and must be recognized by courts, and the title to and right of possession of the property in controversy, which had before the union belonged to the Cumberland church, was held to be in the Presbyterian

church. "In general the factions of a church are not entitled to a partition and division of the property where it is lawfully applied to the purpose of the trust and none of the members are prevented from participation in its use and enjoyment." (34 Cyc. 1169.) The author of the article on Religious Societies, in the American and English Encyclopedia of Law, (vol. 24, p. 357,) says a court of equity may decree a sale of the property of an independent incorporated church organization and a division of the proceeds where the congregation is nearly equally divided by irreconcilable differences in matters of faith and doctrine, "but where the property is lawfully applied to the common purpose to which it was devoted and none of the members are prevented from participation in its use for this purpose, the court will not, at the instance of a seceding faction of the congregation, order a partition and division of the property."

In our opinion appellees made no case under the cross-bill entitling them to any relief, and the trial court erred in decreeing a sale of the church property and in not dismissing the cross-bill. We are also of opinion the court erred in not perpetually enjoining appellees from entering upon and taking possession of the old church site and building a church house thereon. Injunction is a proper remedy for the purpose of restraining unlawful interference with the church property. *Richter* v. *Kabat*, 4 Am. & Eng. Dec. in Eq. 491; 72 N. W. Rep. 600; 1 High on Injunctions, (4th ed.) sec. 305.

In so far as the decree adjudged the title to the church property to be in appellant and enjoined appellees from the use of the name of the society it is affirmed, but for the error in not dismissing the cross-bill, in ordering a sale of the property and division of its proceeds, and in not making perpetual the temporary injunction restraining appellees from entering into and building a church house on the

old site, the decree is reversed and the cause remanded, with directions to the trial court to enter a decree in accordance with the views herein expressed.

*Reversed in part and remanded, with directions.*

Cartwright and Hand, JJ., dissenting.